[Civ. No. 26422.   Second Dist., Div. Two.   Sept. 18, 1963.]

THE PEOPLE ex rel. THE DEPARTMENT OF PUBLIC WORKS, Plaintiff and Appellant, v. THE CITY OF LOS ANGELES et al., Defendants and Appellants.

Charles E. Spencer, Jr., Robert E. Reed, George C. Hadley, Hugh R. Williams, George W. Miley, R. B. Pegram and Harry S. Fenton for Plaintiff and Appellant.

Roger Arnebergh, City Attorney (Los Angeles), Bourke Jones, Weldon L. Weber, Assistant City Attorneys, Peyton H. Moore, Jr., Oliver C. Hardy, Deputy City Attorneys, Samuel Gorlick, City Attorney (Burbank), and James J. Clancy, Assistant City Attorney, for Defendants and Appellants.

HERNDON, J.—The Cities of Los Angeles and Burbank appeal (a) from the judgment entered in a condemnation action brought by the State of California, acting by and through its Department of Public Works; and (b) from the subsequent order apportioning the award between them pursuant to the provisions of section 1246.1 of the Code of Civil Procedure. Although the State of California argues that the judgment should be affirmed, it has filed an appeal urging

that, if the judgment is *not* affirmed, then this court should rule that certain determinations made by the trial court constituted error prejudicial to it. In the interest of brevity, the appellant cities will be referred to hereinafter as "Los Angeles" and "Burbank," respectively, and the respondent as the "State."

All property directly involved herein is owned by Los Angeles and forms a part of Griffith Park. For purposes of clarity, the several parcels of land involved in this action may be considered as constituting three general areas. Area No. 1 contains 9.4159 acres of land, is owned in fee by Los Angeles, and is located northerly of Riverside Drive between Catalina Street and Buena Vista Street; it abuts Burbank's Buena Vista Park on the north.

Area No. 2 contains 7.98 acres, is owned by Los Angeles and is located southerly of Riverside Drive between Catalina Street and Buena Vista Street; it abuts on the Los Angeles County Flood Control Channel on the south. Area No. 3 contains 26.694 acres, is owned by Los Angeles and is located southerly of the Burbank City boundary between Buena Vista Street and Beachwood Drive. It lies north of Los Angeles County Flood Control channel.

With respect to Area No. 1, the State condemned in fee simple for freeway purposes a total of 5.7359 acres, or 61 per cent thereof, leaving a remaining area of 2.20 acres north of the portion taken and a remainder area to the south consisting of 1.48 acres. The jury fixed the value of the land taken from this area at $210,000; it awarded severance damages of $45,000, and found that there were offsetting special benefits in the amount of $7,500.

With respect to Area No. 2, the portion taken by the State consisted of 4.3230 acres, or 54 per cent thereof, leaving a remainder area divided into two pieces containing .577 acres and 3.080 acres, respectively. The award for the property taken was $100,000 and for severance damage $15,000, less special benefits in the amount of $7,500. The value of the land taken from Area No. 3 was found to be $254,000 with no severance damage.

All three areas here involved were acquired by Los Angeles in 1893 by eminent domain proceedings brought by its Board of Public Service Commissioners. Thereafter, on December 21, 1926, pursuant to the provisions of its charter (which became effective on July 1, 1925, and which required all

city-owned lands to be held solely in the name of the City of Los Angeles) said property was conveyed to, and placed in the name of, the city. This conveyance granted the property to the city, its successors and assigns, forever, to be used as and for a public park, subject to the conditions and restrictions set forth therein.

The foregoing recital of facts is deemed sufficient for the purpose of considering the primary assignment of error urged by the City of Los Angeles on its appeal. Additional facts will be presented as required by the other problems presented.

■ The principal contention advanced by the City of Los Angeles is that the trial court erred in its determination "that the compensation to be paid by [the State] for the transfer of said real property ... shall be the value of said property, subject to all restrictions, Charter, deed and otherwise, pertaining to said property on the date of valuation." For purposes of arriving at this determination, the court required that all experts testifying to their opinions as to the fair market value of the property do so solely on the basis (1) that it could be used only for park purposes; and (2) that it could not be sold. It now seems clear that this ruling was erroneous.

In the court below, and on this appeal, the State has urged that "fair market value" was not the proper measure by which just compensation should be determined. It urged that one of two alternative methods should be adopted, i.e. (1) "The public trust theory" which dictates that when the control of property held in trust for the general public is transferred from one public agency to another to be used for the good of the general public, the transfer should be without compensation or with only nominal compensation; or (2) the so-called "federal substitution rule" under which the measure of compensation is the cost of supplying a substitute facility of substantially equal utility, if such substitute is in fact necessary.

On the basis of existing California law, the trial court properly rejected both of these theories. ■ As our Supreme Court stated in *People* v. *LaMacchia,* 41 Cal.2d 738, 751 [264 P.2d 15], citing *Sacramento etc. R. R. Co.* v. *Heilbron,* 156 Cal. 408, 412 [104 P. 979]): "This court 'has definitely aligned itself with the great majority of the courts in holding that damages must be measured by the market value of the

land at the time it is taken, *that the test is not the value for a special purpose, but the fair market value of the land in view of all the purposes to which it is naturally adapted; . . . '"* (Italics added.)

In the cited case of *Sacramento etc. R. R. Co.* v. *Heilbron, supra,* at pages 409 and 415, the following statements appear: "... the rule is of universal acceptance that the measure of this damage is the market value; that is to say, the highest price estimated in terms of money which the land would bring if exposed for sale in the open market, with reasonable time allowed in which to find a purchaser, buying with knowledge of all of the uses and purposes to which it was adopted and for which it was capable. . . . The law universally has adopted market value as establishing actual value, and however clumsy the appellant may think that the method is, it is the best one so far known to the law." The foregoing adequately disposes of the contentions advanced by the State in its appeal, which incorrectly it has denominated a "cross-appeal." (See California Rules of Court, rule 3.)*

■ Whatever may be the rule in other jurisdictions, or in regard to other political bodies, it has been the rule in California since 1861 that lands held by a municipal corporation in its proprietary capacity may not be taken from it by the State without the payment of just compensation. (*Grogan* v. *San Francisco,* 18 Cal. 590, 612 et seq. See also 1 Nichols on Eminent Domain (3d ed.) § 2.225, p. 177 et seq.)

The error of the trial court in relation to the matters to be considered in determining market value appears to have resulted from a misinterpretation of the reasoning which has permitted consideration to be given to restrictions on the use of property created by public easements (see *Muller* v. *Southern Pac. Branch Railway Co.,* 83 Cal. 240, 243-244 [23 P. 265]), or by zoning ordinances (*People* v. *Dunn,* 46 Cal.2d 639, 642 [297 P.2d 964]; *Long Beach City H.S. Dist.* v. *Stewart,* 30 Cal.2d 763, 768-769 [185 P.2d 585, 173 A.L.R. 249]).

However, these expressions are nothing more than logical extensions of the principle that the market value of land is determined by ascertaining what a willing buyer would pay therefor in the light of all the uses to which it is adapted and for which it is available. Such uses obviously are limited by the geological contours of the property, the existing and pro-

*Formerly Rules on Appeal, rule 3.

spective needs of the community, and any legal restrictions presently limiting the uses to which it may be put.

The value of land never is determined by what it *would* be worth to a purchaser if it were in fact subdivided for housing development (*City of Los Angeles* v. *Hughes,* 202 Cal. 731, 733-736 [262 P. 737]), or if some anticipated zone change were actually in effect. (*People* v. *Dunn, supra,* p. 642.) Rather, its value is determined by what a willing buyer would pay for it in its *present* condition. Its suitability for subdivision purposes and the prospect of a future change in zoning are merely matters which a buyer would consider in making a present offer.

To extend these considerations to the park land involved in the instant case, would be to reduce the market value criterion to an absurdity. To ask what a private buyer would pay for land which he could hold only as a *public park,* incapable of being sold, obviously would be a meaningless and useless question. It is self-evident that as a practical matter there could be no market for land dedicated to public park use, and, thus considered, the market value would be nil.

However, it is equally clear that such land does have a value and that this value may be ascertained by determining its *market* value in terms of what private purchasers *would* be willing to pay for it if it were placed upon the market available for all uses to which it is adapted. In such circumstances, of course, the particular use currently being made of it by its municipal owner would not be material for restrictive purposes. "Actual market value is the measure, and not its value in use to the owner. [Citation.]" (*County of Los Angeles* v. *Bean,* 176 Cal.App.2d 521, 528 [1 Cal.Rptr. 464].) "In other words, it is not value in use, either actual or prospective, to the owner that is involved, but value in exchange—market value—that is the test. [Citations.]" (*City of Daly City* v. *Smith,* 110 Cal.App.2d 524, 532 [243 P.2d 46].)

In such circumstances, all relevant considerations would be taken into account, such as prevailing community needs and zoning ordinances, as well as the geologic nature of the land itself. Consideration would not be limited to its present public use, and the "restrictions" which the municipality has placed upon itself in this regard need not frustrate such determination.

Unlike zoning ordinances which apply equally to all

properties and to all property owners within the zone, the so-called "restriction" to a use for park purposes applies only to the city itself, and in reality constitutes nothing more than a declaration by the public agency as to the use which it voluntarily has determined to make of the property. If the city were to place the land on the open market for sale to private purchasers, clearly this unilaterial "restriction" would not be binding. (For decisions in this field from other jurisdictions, see *State* ex rel. *State Highway Com.* v. *City of Albuquerque,* 67 N.M. 383 [355 P.2d 925]; and *Westchester County Park Com.* v. *United States,* 143 F.2d 688.)

The trial of the instant case was conducted in such a manner that this error necessarily impressed upon the minds of the jurors a false conception of the applicable law. The reporter's transcript consists of 2,810 pages and is replete with recurrent arguments revolving around the question of the applicable measure of compensation. The court repeatedly ruled that the awards should be determined upon the basis that the parcels being taken were restricted to use for park purposes with sale by the owner prohibited. After considerable debate between court and counsel, and before the calling of any valuation witness, there was the following exchange: "THE COURT: The property cannot be considered free of restrictions or limitation but must be considered as subject to any deed restrictions or zoning or other restrictions that control or even impair its use . . . . Here we have limitations on the use of this property for park purposes. I think you have to regard those limitations in attempting to value the land. MR. HANSEN [attorney for City of Burbank]: In other words, do I understand that the fair market value of property for park purposes? THE COURT: That is right. That is substantially what it boils down to . . . .

"THE COURT: No. I concede these decisions to mean that you are limited to show the highest and best use for which land similarly burdened as this land is and nothing else. MR. MOORE [attorney for City of Los Angeles]: Did your Honor consider the portions of those cases which hold that the bringing of the condemnation releases the burden in so far as the restriction for park purposes is concerned? . . . MR. HANSEN: In other words, fair market value is the highest and best use of the property, which is park purposes. THE COURT: I think that stated, in essence, is it."

Mr. Brabant was the first valuation expert to be called and the following occurred: "Q. Now, then did you also make studies to determine how this property could be utilized for industrial purposes? MR. WILLIAMS [attorney for State]: Your Honor, I am going to object as incompetent, irrelevant and immaterial, based upon the Court's ruling that this property is restricted to park use. The only use it can be put to is park use and not to industrial use. MR. MOORE: If your Honor please, as I understood the Court's ruling, the Court ruled that we were permitted to show any of the uses to which the property could be put and that the bringing of this condemnation action in effect constituted a sale . . . .

"THE COURT: Oh, no, I never so ruled at all. I ruled directly contrary to that. MR. MOORE: I have the transcript. THE COURT: Have no illusion as to that. I did not so rule. . . . If any language of mine was capable of any other interpretation I will make it very clear now. MR. MOORE: What we would like to do is sort of lay down some ground rules, if we might, rather than to try to bumble through this thing on the basis of a misunderstanding.

"THE COURT: I stated it just as clearly now as it is possible to state. MR. MOORE: That we may not consider the value—I don't quite understand, your Honor. THE COURT: As to what? MR. MOORE: What are we to be permitted to consider with respect to the use of the property? THE COURT: This property is restricted to park use. Isn't that so? MR. MOORE: Yes, your Honor. THE COURT: All right. I have held that the bringing of this action doesn't change that at all and under the *Muller* case there it stands subject to that restriction. . . .

"THE COURT: If any language of mine is capable of that construction I am correcting it here and now. I have pointed out the *Muller* case to you and it is the bible and textbook on which we are proceeding. MR. MOORE: Was the *Muller* case the two condemning bodies? THE COURT: Yes, and moreover it has the merit of being a California decision. MR. MOORE: At this time I offer to prove by the witness David Brabant—the witness David Brabant would testify that if he were called as a witness to testify in that regard that he would testify that the property which has been designated Area 1 for discussion here would have value for use as industrial property and that he could place a value thereon for that purpose."

After another conference in chambers, the following record was made: "MR. MOORE: . . . Now, as I understand Mr. Miley's contention would be that we would not be permitted to use that sale because of the fact that our property was restricted to park use and therefore we not use it. THE COURT: Well, you would have to scale it down to the restrictions that govern your land if you cannot sell it and clear it of the restrictions. MR. MOORE: If you can't sell it, it isn't worth anything. THE COURT: That is exactly right. MR. MILEY: *That is what we said all the time.* THE COURT: *That is precisely correct."* (Italics added.)

"MR. MOORE: This is not a basis of not a market. This is a basis of inability to sell. If that is the contention that the State makes I would like to go right up on that point because we are out of court if we can't testify to what these properties would bring if they could be sold. Then we have no value. We have no value if they can't be sold. THE COURT: *Maybe you have touched the thing there. You said if they could. If they cannot be sold, you are precisely in the situation that you have presented."* (Italics added.)

"MR .MOORE: Is our appraiser restricted from testifying to any use except park use? THE COURT: Unless the usual showing is made there would be a reasonable probability of getting those uses changed, the answer would be yes, once a reasonable probability is established by competent evidence. If you can, you can show whatever—MR. MOORE: As to the part taken there would be absolutely no possible means of showing that, would there? THE COURT: I don't see how or under what theory. The restriction as to that wasn't lifted until the State exercised its power. MR. MOORE: But as of the time that the State exercised its power, they have taken the title so that having exercised the power, supposing we went in and lifted it— THE COURT: I will hold categorically that as to the time when the State took the property, like in the *Muller* case it was restricted to certain uses, and the State took it in the condition in which it found it and it wasn't purged of those uses and restrictions until after the State had acquired it."

Defendants' experts in qualifying were limited to references to sales of properties which had been confined to restricted use with sale forbidden. This is an illustration: "MR. MOORE: We are confronted with a situation in which we have to produce a witness to testify to what the value of

property that can't be sold. The only way that he can equate that value is to base it upon — THE COURT: I know that. That's the rule I told you gentlemen to follow. ... But the question you asked merely asked what it would cost to go out and buy property. Our problem here is to valuate property that is limited to park use and can't be used for anything else. I can't see any logical connection between that connection and the problem. I will have to sustain the objection.''

Counsel for the State say in their brief: ''The trial court ruled that compensation for the subject parcels should be something less than 'fair market value' because of the restrictions that the land could only be used for park purposes, and other restrictions in the deed and the further condition that the land could not be sold, in accordance with provisions of the Los Angeles Charter. The trial court did not attempt to say how much this 'something less' might be, whether it was one cent or any other amount. . . . State contends that the fair market value method of determination valuation is improper to use in these circumstances.''

At the trial, when counsel took the same position, the following appears: ''THE COURT: The term 'compensation' I would construe to mean the equivalent of fair market value of the property. MR. MILEY: We don't think in this case that it is, your Honor, in view of the restrictions upon this property and the fact that this property cannot be sold by the very definition, accepted definitions of fair market value. This property does not meet those conditions, so that was the reason we wanted to have this statement amended so that it could state exactly what was going to be determined, compensation, if any to be paid.'' Thereupon the court ruled: ''I will sustain the objection as far as the witness' use of the term 'compensation' referred to as fair market value, however.''

The plaintiff's expert witness, Mr. Evans, testified as follows: ''Q. BY MR. MOORE: Mr. Evans, in making your appraisal in this case, you did not attempt to appraise the fair market value of any of the properties involved, did you? A. No, I couldn't, Counsel. They are not marketable. ... Yes. If I assumed that it had no restrictions, even though owned by the City of Los Angeles, and could be sold in competition with all other property in the area, of course, I would recognize the enhancement of the M-1 zone. MR. MOORE: Q. And the only reason you disregarded the M-1 zone as to Area 1 was because of the Court's ruling? A. I wouldn't say that.

I would say it is because of an inherent lack of the value of zoning in a piece of property that it is restricted to park use.''

After the debate between court and counsel had been going on in the presence of the jury for a number of days, the instructions were reached and the court told the jury:

"*In the before condition, that is, on* April 24, 1960, the parcels designated in the complaint as Parcels 1, 1A, 1B, 1C 1D, 1E, 1F, 1G, 1H 1I, 1J and 1L and the larger parcels of which said parcels are a part were restricted to use only as a park, and the above parcels described in the complaint and the larger parcels of which said parcels are a part, were restricted to use only as a park and the above parcels described in the complaint and the larger parcels of which they are a part could not be sold. The parcels above designated and the larger parcels of which they are a part have to be valued *in the before condition* subject to these restrictions.'' (Italics by trial judge.)

In another instruction the jurors were told: ''[Y]ou must take into consideration all of the purposes or uses, including the highest and best use, for which the property is adaptable and available in the immediate future, as disclosed by the evidence.'' But: ''Zoning *restrictions and other limitations* on a particular piece of property are elements of availability for a particular use, and the limitations placed upon the use of the property by existing zoning laws, including its present limitations to park uses, should be considered. You should also consider the reasonable probability, if any, of a changes in those *restrictions and limitations* in the near future, and the effect such a probability would have upon the minds of purchasers generally.'' (Italics by trial judge.)

The conclusion seems inescapable that the jury must have been impressed with the court's idea that the compensation to be awarded was something *other,* something *less,* than fair market value. It is true, as argued by respondent, that Los Angeles' two experts succeeded before they finished their testimony, in stating values which they said were the same as if the property were not restricted. We quote from the testimony of the witness Brabant:

''I am saying in effect that in an area such as we are talking about here, Area 1, we have M-zoned property. The question is, how to value this property, and I valued it on the basis of sales of similar property in the area similarly zoned,

that is, sales of similar property. THE COURT: Zoned as what? THE WITNESS: M-1. THE COURT: What attention did you give to the fact that it is restricted to park use? THE WITNESS: I considered the restriction and I felt that the indication is that—and I concluded as far as my valuation was concerned—that the valuation of this property should be predicated upon the indicated price for considering other sales of property in the surrounding area. Q. BY MR. MOORE: Is that the process of equating? THE COURT: With or without park restrictions? THE WITNESS: With or without. THE COURT: What did you assume? THE WITNESS: That the valuation would be the same. THE COURT: You mean that the park restriction meant nothing to you? THE WITNESS: That's right.''

When they heard such testimony the jurors must have concluded that the witnesses were evading the court's rulings and were placing values on the proerty in excess of those produced by application of the true rule as defined by the court. Thus appellant, through the judge's repeated erroneous rulings, was deprived of a dispassionate and impartial consideration by the jurors of its experts' testimony.

■ In connection with this general assignment, Los Angeles also argues that it was error for the trial court to exclude evidence of the price paid to Walt Disney Productions, a corporation, for lands owned by it and included within the instant condemnation action as originally filed.

■ It is, of course, true that since the decision in *County of Los Angeles* v. *Faus,* 48 Cal.2d 672, 676 et seq. [312 P.2d 680], evidence of the prices paid for similar property in the vicinity, including prices paid by the condemner is admissible, but, as this court noted in *People* ex rel. *Dept. of Public Works* v. *Murata,* 161 Cal.App.2d 369, 375 [326 P.2d 947], ''. . . we interpret the *Faus* decision as holding also that a 'wide discretion' must be granted the trial judge in determining the admissibility of evidence of other sales; that the laying of appropriate foundations should be required to keep the admission of such evidence 'within safeguarding limits' and that evidence of the price paid by a condemner should be admitted as evidence of value only after the trial judge has been satisfied 'that the price paid was sufficiently voluntary to be a reasonable index of value.' ''

■ The Disney land adjoined appellant's land, and, as indicated, was originally a part of the property being condemned. During the pendency of the action, it was sold to

plaintiff for the exact amount of the State's appraisal, $142,075; it was satisfied with the deal and so was the Disney corporation, as shown by statements of its attorney who negotiated the deal. There is no evidence of pressure brought by either side or of ultimate dissatisfaction with the deal. *County of Los Angeles* v. *Faus, supra,* 48 Cal.2d 672, expressly sanctions introduction of evidence of the purchase price of property bought by the condemner during the eminent domain proceeding, property which is initially the subject of the condemnation, if the price paid be sufficiently voluntary to afford a reasonable index of value.

Disney's property was immediately adjacent to that of defendant, within the same building zone, M-1, and was unimproved acreage. True, the condemned portion of Disney's land consisted of 2.55 acres, while that taken from defendant comprised 27.4519 acres. There is nothing in these factors, however, to indicate any lack of true comparability with respect to these two properties.

The court did add these remarks: "The *Murata* case suggests the caution with which the Court should receive evidence of transactions under eminent domain in the case before it and it does seem to me that if the rules were relaxed at all, we would open ourselves to a maneuver of a condemning party or the condemnees rigging a sale at the outset of the proceedings for the very purpose of bringing in the evidence into court and I think that justifiably transactions within the limits of an eminent domain proceeding are to be viewed very cautiously." There is nothing in this record to suggest any "rigging" of a sale, and no room for such suspicions in ruling upon the evidence.

The wide discretion vested in the court in this area is not one to be exercised *ex gratia.* "The discretion intended, however, is not a capricious or arbitrary discretion, but an impartial discretion, guided and controlled in its exercise by fixed legal principles. It is not a mental discretion, to be exercised *ex gratia,* but a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. In a plain case this discretion has no office to perform, and its exercise is limited to doubtful cases, where an impartial mind hesitates." (*Bailey* v. *Taaffe,* 29 Cal. 422, 424.)

"The term implies absence of arbitrary determination,

capricious disposition or whimsical thinking. It imports the exercise of discriminating judgment within the bounds of reason. Discretion in this connection means a sound judicial discretion enlightened by intelligence and learning, controlled by sound principles of law, of firm courage combined with the calmness of a cool mind, free from partiality, not swayed by sympathy or warped by prejudice or moved by any kind of influence save alone the overwhelming passion to do that which is just.'' (*People* v. *Surplice,* 203 Cal.App.2d 784, 791 [21 Cal.Rptr. 826].)

■ In view of the showing made in the instant case, proffered evidence of the price paid to Walt Disney Productions for its lands should have been admitted.

We turn now to the single separate assignment of error advanced by the City of Burbank, which relates only to the judgment itself, as distinguished from the order of apportionment; and, as to this aspect of the appeal, the State is regarded as respondent.

■ Burbank's interest in the instant action arises in the following manner. In 1942, Burbank purchased 40 acres of land from Los Angeles and took a conveyance which restricted 10 acres thereof, lying northerly of the present taking, to use as a public park. Thereafter, on April 14, 1945, Los Angeles and Burbank entered into an agreement wherein Burbank was given ''the irrevocable right, license and permission for and during the term hereinafter specified to develop, maintain and use for park purposes only,'' the land described herein as Area No. 1. This ''right, license and permission'' was for a period of 10 years with the right to extend for an additional 10 years.

Under the terms of this agreement, Area No. 1 was to be developed by treating it and Burbank's Buena Vista Park (the 10 acres immediately to the north which had been restricted to park use in the earlier transfer) as a single unit in their development for park purposes. The park improvements on Area No. 1 were to be at the expense of Burbank and were to be made at Burbank's discretion when means were available.

However, the plans therefor had to be submitted to Los Angeles for approval, and any modifications, alterations, changes or additions therein were to be made only by mutual consent. Burbank agreed to pay all taxes and to carry public liability insurance to protect both cities. Burbank was gran-

ted the exclusive management of the area, subject to certain restrictions on the use which could be made thereof, and it was provided that there should be no discrimination between the residents of the two cities in the matter of granting permits to use the area.

It was provided that, at the expiration of this agreement, all fixtures, equipment, property, and improvements affixed to the land in Area No. 1 (except growing trees, plants, and shrubbery) which had been installed by Burbank would remain the property of Burbank, but Los Angeles was given the option of purchasing the same. Burbank paid nothing by way of direct consideration for the rights received under this agreement. The right to extend the agreement for an additional 10 years was exercised by Burbank, so that, at the time of the taking herein, Burbank's rights in Area No. 1 under the agreement were to continue for approximately four more years.

Following the execution of this agreement, Burbank began developing its own Buena Vista Park and Area No. 1 as a park, but none of the park buildings was located on the property being acquired by the State in this proceeding. (Areas 2 and 3, although a part of the much larger area known as Griffith Park, were undeveloped raw acreage.) Burbank contends that it was error not to include the 10 acres owned by it in fee and lying north of Area No. 1 in the "larger parcel" for purposes of determining severance damages. We find no error in this determination. As stated in *City of Menlo Park* v. *Artino,* 151 Cal.App..2d 261, 269-270 [311 P.2d 135]:

"Under Code of Civil Procedure, section 1248, the owner is not entitled to severance damages for injury to separate and independent parcels. To recover severance damages there must be *unity of title* (*San Benito County* v. *Cooper Mt. Min. Co.,* 7 Cal.App.2d 82 [45 P.2d 428] ; *City of Stockton* v. *Ellingwood,* 96 Cal.App. 708 [275 P. 228] ) contiguity, . . . and unity of use. [Citation.] " (Italics added.)

"Severance damages are allowed only to the extent the market value of the land severed from the land condemned is diminished by such severance or by the public use of the land taken. In other words, the measure of damages is the depreciation in market value of the part not taken from the condemnee." (17 Cal.Jur.2d, Eminent Domain, § 109, p. 677.)

In the instant proceeding, all land taken was owned by Los Angeles and none owned by Burbank was taken. Burbank, of course, had certain rights to use the land taken from Los Angeles, but it received compensation for the loss of such rights in the subsequent order of apportionment. Whatever the nature of Burbank's rights in the Los Angeles land during the remaining four-year term of the agreement, they did not constitute such an *ownership* of the land that it could be said that a unity of title existed in Burbank in both the Los Angeles land and its own separately owned land so that it was entitled to receive compensation for the alleged *permanent* depreciation in the value of its own lands not otherwise involved in the taking.

The rationale underlying this ruling is well expressed in *People* ex rel. *Dept. of Public Works* v. *Symons,* 54 Cal.2d 855 [9 Cal.Rptr. 363, 357 P.2d 451]. There a defendant, whose land was not directly taken for freeway purposes, sought to recover damages allegedly resulting from the construction of the freeway when thereafter a portion of his land was taken in order to form a cul-de-sac turning area required due to the closure of a street resulting from the freeway construction. It was there stated at page 860:

"It is established that when a public improvement is made on property adjoining that of one who claims to be damaged by such general factors as change of neighborhood, noise, dust, change of view, diminished access and other factors similar to the damages claimed in the instant case, there can be no recovery where there has been no actual taking or severance of the claimant's property. [Citations.] Accordingly, in the case at bar, had the parcel for the cul-de-sac not been taken, the defendant would not be entitled to recovery based on the general diminished property values due to the construction of the freeway on adjoining property. It is manifest, then, that the crucial question here is whether the defendants, whose property was taken for purposes other than the construction of the freeway itself, are entitled to compensation, as severance damages, for those impediments to the property resulting from the objectionable features caused by the maintenance and operation of the freeway proper on lands other than those taken from the defendants."

After discussing the California decisions holding that the "improvement," or the objectionable portion thereof, must actually occur upon lands owned by the condemnee, the court concluded at pages 861-862: "We have before stated that

'The courts have assumed the burden and responsibility of defining those rights [of property owners] and of limiting their extent because of the necessity of safeguarding the constitutional rights of private parties ... and of seeing to it that the cost of public improvements involving the taking and damaging of private property for public use be not unduly enhanced. . . .' [Citation.] The courts have not authorized a recovery under article I, section 14 of our state Constitution where there would be no recovery for damages caused by the construction of an improvement if undertaken by a private citizen on adjoining property. [Citations.] Yet, the defendants seek to accomplish just that in the instant case. To thus enlarge the scope of the state's liability under article I, section 14, would impose a severe burden on the public treasury and, in effect, place 'an embargo upon the creation of new and desirable roads.' [Citation.]''

In the instant action, Burbank's rights in the Los Angeles property denominated Area No. 1 would have expired by the terms of the agreement in approximately four years. While one might speculate that further extensions might have been agreed upon, it is clear that Burbank had no legal right to any such extensions. (Cf. *East Bay Mun. Utility Dist.* v. *Kieffer,* 99 Cal.App. 240, 247 [278 P. 476, 279 P. 178].) Nonetheless, Burbank claims that it should be compensated for the permanent diminution in value of its property lying north of Area No. 1 because, *inter alia,* the freeway to be constructed over Area No. 1 will prevent a person standing on Burbank's property and looking to the south from having "an unobstructed view to the beautiful hills in the distance." Neither reason nor legal precedent would warrant allowing Burbank compensation for such damages upon the theory that its rights under the agreement in Area No. 1 made its own separately owned property a part of the "larger parcel" upon which severance damages must be fixed.

The remaining assignments of error presented by Los Angeles and Burbank relate primarily to the subsequent apportionment proceeding had under section 1246.1 of the Code of Civil Procedure. The jury's verdict awarded Burbank $45,000 of the $210,000 previously found to represent the value of the property taken in Area No. 1 and $15,000 of the $45,000 which had been fixed as the severance damage thereto.

Both cities have exerted considerable efforts in seeking to establish the exact legal compartment into which the interest of Burbank, created by this obviously *sui generis* agreement, should be placed. We are inclined to agree with the trial court's statement that: "It is difficult to conclude that this agreement is anything but a temporary agreement between two cordial municipal neighbors." However, apparently for purposes of designation, the court chose to refer to the interest created thereby as "an easement in gross." Burbank urges that it should be considered a "leasehold," since it has certain characteristics thereof, while Los Angeles urges that it is more aptly to be described "a license coupled with an interest," since it is denominated as a "right, license or permission."

We consider it both inutile and inadvisable for us to engage in any attempt to fit this unique interest into some historic legal category. As so aptly stated in the early case of *Painter* v. *Pasadena Land & Water Co.,* 91 Cal. 74, 84-85 [27 P. 539] : "... the intention of the parties is clearly expressed in the deed, and this being so, little weight should be attached to technical definitions of terms used. *It matters but little what name we give to the rights reserved to the grantor in the deed. Attempts to create symmetry in the law by classification and designation of classes of different kinds of rights connected with and springing out of lands are always hazardous.*" (Italics added.)

This is particularly true here where neither party suggests how the value of Burbank's interest would have been either enhanced or diminished by the court's giving it a different descriptive name. The jury, having heard all of the original lengthy trial, was well informed concerning the interests of the parties. And the court, in its instructions in the apportionment proceeding, read the pertinent parts of the agreement to them. The jury's verdict does not appear basically inconsistent with the respective interests of the parties, and any attempt further to delineate them legally doubtless would have served only to create confusion.

Each party assigns as error the refusal of the trial court to strike the testimony given by the other's expert witnesses. Many of the erroneous bases and assumptions upon which the opinions of these experts were founded, were disclosed, and perhaps adequately exposed, during their respective cross-examinations. In fact, many of the objectionable portions of

this testimony related to speculations by the witnesses as to what matters the jury itself had considered in making its original award. It appears most unlikely that the jury was misled as to its own intentions and therefore we need not determine whether the court abused its broad discretion in this respect.

It appears clear, however, that witnesses on both sides failed to conform to the requirement that the purpose of an apportionment proceeding is to determine the "proportions" or "fractional" interests of the parties in the award actually made by the jury. Rather, each appears to have appraised the interest of the City of Burbank at the figure which they considered to be representative of its true value, without regard to the total amount already fixed by the jury, and then ascribed the residue remaining as the value of the interest of Los Angeles.

This error, although present in the testimony of both appraisers, was most clearly expressed by Burbank's expert witness, who flatly stated: "Of the $210,000 [for] the part taken I attribute $81,538 to the City of Burbank, the part taken. This is before any [severance] damages, and $128,462 to the City of Los Angeles, *although I didn't appraise the City of Los Angeles' interest. I was only appraising Burbank's.*" When later he was asked, "In considering this $210,000, which was allowed by the jury for the land and the improvements taken, what did you consider to be the value of the Los Angeles interest?" He answered, *"Whatever was left after Burbank got theirs."* (Italics added.)

Manifestly, such an approach is not consistent with the requirements of section 1246.1 of the Code of Civil Procedure, which provides that following the determination of the total award to be paid by the condemnor for the taking of land divided into two or more estates or interests, "thereafter in the same proceeding the respective rights of [the owners of the divided estates or interests in the land] *in and to the award* shall be determined by the court, jury, or referee and *the award apportioned accordingly.*" (Italics added.)

Obviously, this cannot be done by means of making a new and independent appraisal of one party's interest alone and then ascribing the remainder to the other. This would permit the reassertion by the owner of one divided interest, to the detriment of the coowner, of an evaluation that perhaps

already has been rejected by the jury. If the expert testifying in the apportionment proceeding feels that a new appraisal would assist him in arriving at the proportionate interests of the parties he should appraise the value of the interests owned by both parties. The total of his appraisal might very well vary from the amount already determined by the jury, but he would then have arrived at a true fractional percentage that could be applied to the award actually made.

In the instant case, Burbank's expert witness testified that his independent appraisal of Burbank's interest in the land taken had led to his opinion that its value was approximately $80,000. He did not make such an appraisal of Los Angeles' interest, but if he had it might well have been his opinion that its value was $240,000, i.e., that the overall value of the land, *in his opinion,* was $320,000 rather than the $210,000 allowed by the jury. From this he would have been able logically to state that Burbank's interest *in the award* was one-fourth thereof, or $52,500.

The total inappropriateness of attempting to arrive at the value of a fractional interest without reference to some definite evaluation of the total was exemplified when this witness stated that although the jury had awarded only $45,000 for severance damages, less $7,500 special benefits, it was *his* opinion that the *severance damages suffered by Burbank alone were $56,292, or $19,962 more than the net severance damages to be paid both parties by the award.* He stated his awareness that this additional amount would have to be taken out of the remainder share which he had allotted to Los Angeles as the *value of its interest in the land taken,* but stated that he felt this was fair since, despite the jury's contrary determination, Los Angeles received great special benefits by reason of the fact that the agreement between the parties could be terminated and Los Angeles could then sell the property for industrial purposes at a price greater than its value before the taking.

While Los Angeles' expert witness was not so glaringly unreasonable in his approach, it is equally clear that he, too, fixed a dollar value on Burbank's interest by means of an independent appraisal and such value would have been the same in his opinion, regardless of the jury's actual award. As heretofore indicated, such testimony may not have misled the jurors as to their intentions in making the original award, but certainly they were not benefited by opinions

arrived at in the manner here disclosed, and they very probably were confused thereby.

The remainder of the many objections made by each party to the testimony of the other's expert relate to the correctness of the interpretation such experts placed upon the rights of the parties stemming from their agreement. These interpretations were for the jury's consideration and were properly made the subject of the arguments of the respective parties at the close of the hearing. Any errors in interpretation in this instance, at least, would go to the weight to be given the opinion of the expert so in error and not to the admissibility of his opinion *in toto,* and no useful purpose would be served by our considering these arguments in detail.

Burbank advances the further argument that it should have been entitled to share in the award made as to Area No. 2. Its contentions in this regard are based upon a purported amendment to the 1945 agreement in 1951 which would have included Area No. 2 therein under the same approved by the city council, Los Angeles argues that it is invalid under the terms of its charter. We need not determine this question, however, in order to uphold the trial court's ruling that, since Burbank never had made any improvements on Area No. 2, and since the resolution of its council in 1954 exercising its option to extend the 1945 agreement expressly defined the property involved as including only Area No. 1, Burbank had acquired no interest in Area No. 2 which would entitle it to compensation as of the date of this condemnation action.

Finally, we must consider the claim of Los Angeles that it was improper to consider as a special benefit to it the result of the relocation of a portion of Riverside Drive. This is a city street of Burbank, although originally it traversed and divided the land here denominated as Area No. 1. As the result of the freeway construction, this portion of the street was abandoned pursuant to an agreement entered into between Burbank and the State in accordance with the provisions of sections 100.2 and 100.25 of the Streets and Highways Code. This portion of the former road was physically abandoned and all pavement removed, thereby giving Los Angeles an additional 1.04 acres of land unencumbered by this surface usage.

Actually, Los Angeles does not appear to contend that this

increase in the amount of its usable acreage was not an advantage to it. Rather, it asserts that it is not actually free to avail itself thereof, because as yet the easement has not been formally vacated by Burbank under the terms of the Street Vacation Act of 1941. (Sts. & Hy. Code, §§ 8300-8374.)

This issue was decided contrary to the present contention of Los Angeles by the recent decision in *Armas* v. *City of Oakland,* 183 Cal.App.2d 137, 138 et seq. [6 Cal.Rptr. 750]. It was therein held that section 100.2 of the Streets and Highways Code, which specifically authorizes a city to enter into an agreement with the Department of Public Works "to close any city street ... at or near the point of its interception with any freeway ... ," provides an alternative method of proceeding without complying with the formalities of other acts. When Burbank entered into its agreement with the State which closed the former Riverside Drive at its point of entry into Area No. 1, and physically rerouted it over Area No. 2, it effectively abandoned that portion lying in Area No. 1 for all purposes here requiring consideration.

We are not concerned here with any determination as to what might be the rights, in factually different cases, of landowners whose property may abut upon an abandoned portion of an easement or public facility. Here, the rights of the public in the use of the road were retained in its relocated route and clearly the only abutting landowner, Los Angeles, was in no way damaged by the vacation of the portion of the former route bisecting Area No. 1. It follows that Los Angeles may not be heard to urge that it should not be credited for this obvious benefit on the ground that, if Burbank were to comply with the more formal methods of street vacation, it, Los Angeles, the only interested party, might have a right to protest such closing.

The judgment and the order under review are reversed.

Fox, P. J., and Ashburn, J., concurred.