[Civ. No. 32881. Second Dist., Div. Five. May 16, 1969.]

THE PEOPLE ex rel. DEPARTMENT OF PUBLIC WORKS, Plaintiff and Appellant, v. CITY OF LOS ANGELES, Defendant and Respondent.

Harry Fenton, R. B. Pegram, Joseph A. Montoya, Richard L. Franck, George W. Miley and Charles E. Spencer, Jr., for Plaintiff and Appellant.

Roger Arnebergh, City Attorney, Peyton H. Moore, Jr., Assistant City Attorney, Richard Laskin and Norman L. Roberts, Deputy City Attorneys, for Defendant and Respondent.

STEPHENS, J.—This appeal is from a judgment in an eminent domain action following trial by jury. The State Department of Public Works (State) is the condemning body, and the City of Los Angeles (City) is the property owner. The property condemned consisted of a portion of a City park commonly known as the "Victory-Van Owen Park," and was taken for freeway and stormdrain purposes. Though all of the property necessary for the State's purposes is within the park area, various "parcel" designations used in the pleadings and in the trial refer to portions or the whole of lots shown on a tract map. The trial of the condemnation action took 10 weeks, and the transcript extends to over 3,250 pages. The valuation for all the property taken was fixed at $4,379,122. The appraised value placed on the property by the owner was $5,774,749, and by the condemner, a low of $1,809,315. The appeal is not unexpected, though the questions raised are but four in number—a considerable compliment to the acumen of the trial judge.

Since a portion of a City park was being condemned, reference must be made to Streets and Highways Code section 103.5,[1] which authorizes the taking, and section 103.7,[2] which

[1]Streets and Highways Code section 103.5: "The real property which the department may acquire by eminent domain, or otherwise, includes any property dedicated to park purposes, however it may have been dedicated, when the commission has determined by such resolution that such property is necessary for State highway purposes."

[2]Streets and Highways Code section 103.7: "Publicly owned real property dedicated to park purposes, other than state parks, when acquired for state highway purposes by eminent domain, shall be compensated for by the department on the basis of the fair market value of the property taken, considering all uses for which it is available and adaptable regardless of its dedication to park purposes, plus the value of improvements constructed thereon. If the part taken is only a portion of a larger parcel of park property, the damages, if any, and the benefits, if any, to the

sets forth the method or theory of market valuation, premised upon the park land not being subject to a dedication to park purposes.

Section 103.7 was added to the Streets and Highways Code and became effective on September 20, 1963. This section specifies the method of valuation of park property in eminent domain actions. The effective date of this section was some three months plus after the filing of the instant action, and at the time of trial a question was raised as to the applicability of the section. The trial court determined that the section did apply, and neither party now questions that conclusion. We therefore need not analyze the correctness of the holding as to the application of the statement of law *generally*, but we do adopt the parties' acquiescence as either establishing the rule of law as to this case, or as a waiver of any additional claim of damages which may have existed under a broader legal rule. (Cf. *People* ex rel. *Dept. of Public Works* v. *City of Los Angeles*, 220 Cal.App.2d 345 [33 Cal.Rptr. 797].)[3] Reference to both Streets and Highways Code section 103.7 and to *220 Cal.App.2d 345* informs us that, to arrive at a fair market value of property taken for freeway purposes, the value is not based on the property's value as *park* property. In this respect, we note that the first sentence of section 103.7 is a codification of the law pronounced in *220 Cal.App.2d 345*. The court in the cited case recognized that market value of land was that value which a willing buyer would pay in the light of all the uses to which the land was adaptable and available and that value which a willing seller would accept, he having full knowledge of its uses. The factors entering into market value included not only the ground contour and condition, but both *existing* and *prospective* community needs, as well as present limitations of use (legal restrictions) plus the reason-

remainder by reason of the taking and the construction of the highway improvements in the manner proposed shall be on the basis that the remaining property is devoted or dedicated to park purposes and offset in accordance with Section 1248 of the Code of Civil Procedure.

"In lieu of such compensation, the department and the owner or agency in charge of such park property may provide by agreement where it is found economically feasible so to do that the department may provide substitute park facilities of substantially equal utility, or facilities of lesser utility with payments representing the difference in utility, or may pay the reasonable cost of acquiring such substitute facilities."

[3]Since there is more than one case titled "*People* ex rel. *Dept. of Public Works* v. *City of L. A.*," reference to this case will hereinafter be made by citing its volume and page number, i.e., *220 Cal.App.2d 345*.

able probability of alteration of such limitations of use (zone changes). As in *People* ex rel. *Dept. of Public Works* v. *Arthofer*, 245 Cal.App.2d 454, 462-463 [54 Cal.Rptr. 878], it is recognized that "[t]he jury is entitled to consider those factors which a buyer would take into consideration in arriving at fair market value in the event said buyer contemplated a purchase of the property. [Citations.] *Plausible* and *probable* changes in the character of the neighborhood and in the *zoning restrictions* in the area constitute factors which a buyer would consider in arriving at an opinion as to the fair market value. [Citations.]. . . . The general rule is that present market value must be determined only by uses for which land is *adaptable* and *available*. [Citations]." (Italics added.)

It is apparent that there would exist no "willing purchaser" (excluding some other governmental body) to purchase a dedicated park if there were no other use possible; hence, either the value of the park property would be nil, as reasoned in *220 Cal.App.2d 345*, or the restrictive park use would have to be disregarded, placing the property in the same zoning status in which it had been before the park use limitation was imposed. That is, if the property had been zoned R-1 before it was dedicated to park use, for condemnation purposes it would be considered as zoned R-1 at time of trial. By this fiction, a presumptive "willing buyer" could be envisioned. Though this rule had been formed through case law, it was not until the enactment of section 103.7 of the Streets and Highways Code that it was codified.

Of course, once the fiction of the dissipation of park use limitation was effective, the property involved became like any other piece of property, and its market value depended not on its *then* use, but on the *reasonable probability* of its use for the *highest* and *best* (most valuable) use. (*People* v. *Loop*, 127 Cal.App.2d 786 [274 P.2d 885]; *City of Napa* v. *Navoni*, 56 Cal.App.2d 289 [132 P.2d 566].)

The major contention made here revolves around the establishment of valuation of the condemned property and around the question of potential zoning. Except for two "parcels," each comparatively small in consideration of the entire acreage taken, the State's appraisers and the City's appraiser differed in opinion as to the "reasonable probable zoning" of the property. So far as the property to be taken for freeway use is concerned, as distinguished from that remaining, the applicability of rules relating to market value as above set

forth were not in dispute between the parties. The importance of the difference in the opinions as to the "probable zoning" is apparent by reference to a portion of the property designated "Parcel 1A," though it relates to nearly all of the other parcels. As to Parcel 1A, the State's appraisers concluded the probable zoning, disassociating the property from park dedication, would be "R-1" (single-family residence), "R-4" (multiple-dwelling residences), and "park" (Parking use), and valued this parcel at $25,000 or $27,500 per acre for the greatest portion thereof (R-1), $40,000 for a part thereof (R-4), and $65,000 to $75,000 for a small portion as "Park." The total market value placed on Parcel 1A by the State was $736,150. The City, however, took the position that the probable zoning would be "Com'l" (commercial), and valued it at $131,000 per acre, or a total market value of $2,588,214. Since all of the property being taken was held for City park property but, as "plain" property, before park purpose dedication, had been zoned R-1 and R-A (residential, agriculture), the issue of any reasonable probability of a zone change was most critical. It is towards the discrepancy in the various appraisers' opinions that the first posed claim of error is directed.

I

The first question posed by the State is: "Where the defendant City's expert witness has an opinion of reasonable probability of zone change to commercial, may the plaintiff call, and have the City's employee who is charged with giving such opinions to property owners and purchasers, not only state that he did not state to defendant's witness that there was a probability of zone change to commercial *but that his opinion of reasonable probability of zone change was limited to parking, multiple, and commercial-manufacturing on part and that most of the property would not be subject to a zone change?*" (Italics added.)

In arguing this expressed question, the State includes various problems, though they do not all seem to relate to the limited question. We therefore treat with the arguments expressed in the brief, rather than limit the opinion to the "contention" itself.

The City's appraiser and those for the State consulted with two specific employees of the City who were in the Planning

Department. These two city employees, Golden and O'Grady, were charged with the duty of giving opinions as to the reasonable probability of zone change to the interested public. It was to these persons that a prospective purchaser of property would go in his search for information of zone change probability. One proper, and even necessary, source of inquiry by an appraiser of the subject property was the City Planning Commission and Department. (*People* ex rel. *Dept. of Public Works* v. *Arthofer*, *supra*, 245 Cal.App.2d 454, 469.)

During the course of the testimony of the appraiser for the City, he referred to the statements of opinion received from Golden and O'Grady, and testified their stated opinion to be that the reasonable probable zone change would be to *commercial*. On the other hand, the appraisers for the State testified they were told the probability of zone change would be to multiple residential, manufacturing, and single-family residential. The State produced Golden and O'Grady as witnesses and was permitted, through these City employees, to impeach the City's appraiser by their testimony that they *had not* given an opinion that there was a reasonable probability of a zone change to "commercial." The State claims it was prohibited, however, from eliciting any opinion of Golden and O'Grady to the effect that there was no reasonable probability of zone change to "commercial," or as to what zone change was believed by them to be reasonably probable. To place the contention now posed by the State in its simplest form is to say they allege it error for the trial court to have excluded the statement of opinion of two City employees as qualified experts in the field of "reasonable probability of zone change." Since this "reasonable probability of zone change" was the crucial issue, the opinion-testimony of the City's employees would have been tantamount to expert opinion in the broader appraisal field of market value. Conceding for the moment that both Golden and O'Grady were qualified experts, was the court correct in excluding their testimony, as experts, by virtue of the provision in the first pretrial order? The language there set forth is: "In the event a party intends to use an expert other than those who will testify with respect to valuation as set forth above, said party shall disclose, prior to the final pretrial in this case, if possible, or as soon thereafter as such information is available, the name and address of said person, if known, and the nature of the testimony of said

witness to be used at the trial of this case."[4] Thus we see that this paragraph of the first pretrial order requires the designation of *any expert witness,* and is not limited strictly to valuation experts (appraisers).[5] Also contained within the first pretrial order is a directive as to matters which are to be included within an appraiser's report.[6] Obviously, the State knew that the City appraiser had communicated with Golden and O'Grady, just as had the State's appraisers. It knew that the City appraiser arrived at a probable zone change materially different than that given by the State appraisers. Thus, so far as presenting the testimony of Golden and O'Grady as to their *expert opinion* of the probability of zone change, the State was properly held to the pretrial provisions, and no error of exclusion of such testimony by the court resulted. (*Swartzman* v. *Superior Court,* 231 Cal.App.2d 195 [41 Cal. Rptr. 721].)

 The court was correct in admitting the testimony of Golden and O'Grady to impeach the City's appraiser with respect to his statement of what the two men had told him. As noted, they each denied stating that a zoning change to commercial was reasonably probable. Much is made by the State of the importance of admitting the opinion-evidence of Golden and O'Grady due to their peculiar position with the City, and they urged the admission as from "qualified experts." As we have noted, such opinion-testimony would be on the State's case in chief, and not limited to rebuttal. The impeaching evidence was proper rebuttal. In *People* ex rel. *Dept. of Public Works* v. *Donovan,* 57 Cal.2d 346, 357 [19 Cal.Rptr. 473, 369 P.2d 1], the court said: "The offer of additional opinion evidence was merely cumulative of the defendant's case in chief. In such circumstances there is no abuse of discretion in disallowing it." In the case before us, such additional opinion evidence would not only have been cumulative,

---

[4]The reference to "an expert as to valuation as set forth above" refers to appraisers as well as "any witness to testify on direct examination to any opinion of value, a sale, a reproduction study or capitalization study."

[5]The names of Golden and O'Grady were not disclosed at the pretrial hearing.

[6]"A statement of the appraiser's opinion of the highest and best use of the property. If such use is inconsistent with the present zoning, a concise statement of factual matter upon which the opinion of probable zone change was predicated. . . ."

but in contravention of the pretrial order.[7] What Golden and O'Grady may have specifically said to the City's appraiser, in addition to their impeaching denials of what that appraiser said they said, was never sought by the State during its examination of these witnesses. The court does not appear to have excluded such specific statements as rebuttal fact: "The Court, however, is not restricting and does not intend to restrict the plaintiff [State] from eliciting proper and admissible testimony by Messrs. Golden and O'Grady as to any contrary facts to the testimony given by Mr. Brabant [City's appraiser]." The State examined both of these men, but did not seek to elicit what they did tell the City's appraiser. In fact, at the conclusion of the examination under section 776 subdivisions (a) and (d)(2) of the Evidence Code,[8] the City, in its examination of Golden, asked: "After that discussion Mr. Golden, didn't you give Mr. Brabant an opinion as to the potential commercial use of that property, either as to zoning or a conditional use permit?" at which time the following colloquy took place:

"MR. MONTOYA [attorney for the State]: To which I'll object, your Honor. Number one, it's leading. Number two, it's outside the scope of cross-examination. Number three, it has nothing to do with anything in this proceeding. No one has ever mentioned using a conditional use permit or a zoning variance.

"Mr. Brabant [City's appraiser] testified categorically solely to a zone change.

"MR. LASKIN [attorney for City]: Your Honor, that was in response to cross-examination by Mr. Montoya. On direct examination the witness mentioned several times commercial use, either under zoning or conditional use permit.

"THE COURT: The objection is overruled. You may answer it.

"Q. BY MR. LASKIN: Mr. Golden, did you give Mr. Brabant

---

[7]The record does not reveal any motion on the part of the State to be relieved from the pretrial order in this regard.

[8]Evidence Code section 776 subdivisions (a) and (d)(2): "(a) A party to the record of any civil action, or a person identified with such a party, may be called and examined as if under cross-examination by any adverse party at any time during the presentation of evidence by the party calling the witness." "(d) For the purpose of this section, a person is identified with a party if he is: . . . . (2) A director, officer, superintendent, member, agent, employee, or managing agent of the party or of a person specified in paragraph (1), or any public employee of a public entity when such public entity is the party."

an opinion relating to the potential commercial use of this property?

"Mr. Montoya: To which I'll object. It's incompetent, irrelevant and immaterial; under counsel's own approach to this case, he got this Court to rule that this witness wasn't competent to express an opinion and now he is asking him to do what he said himself the witness wasn't good enough to say.

"The Court: Counsel's position is well taken. The testimony is received here not for the purpose of giving this particular witness' opinion of reasonable probability of a zone change of the parcel involved; it's only received for the limited purpose of testing the credibility of the witness, Mr. Brabant.

"Ask your next question, counsel." No further questions were asked, and the witness was excused. As we read this record, the State in effect is complaining of a limitation not imposed and an exclusion of testimony not elicited or offered. (*Hunton* v. *California Portland Cement Co.,* 50 Cal.App.2d 684 [123 P.2d 947].)

## II

■ The second question raised by the State is: "May the opinion of reasonable probability of zone change, given by the defendant City's employee charged with giving such opinions to the public, be received as an admission or declaration?" The answer to this question is in the affirmative.

During the course of the testimony given by the State's appraiser, Mr. Schmit, he was asked, "Now going back to your interview with Mr. Golden and Mr. O'Grady, does this overlay represent the opinion as to reasonable probability of zoning on the subject properties in the before condition excluding all influence of the freeway that they expressed to you?" The answer was: "In answer to your question it does represent the opinion of Mr. Golden. It does represent the opinion of Mr. O'Grady, and based on my interviews and what I learned in my conferences and discussions with them, there are no deviations on the overlay which are inconsistent with any opinion expressed by either one of these two gentlemen."

The ruling of the court granting its reserved motion to strike the above answer is the basis for this claim of error by the State.

While we agree with the State's contention that it was error to grant the motion to strike the answer, it is not prejudicial since it was but one of seven references by the State's

appraiser to the same or similar facts.[9] That the court struck but the one question and answer, leaving the other six references for jury consideration, is clear from the record:

"MR. LASKIN [attorney for City]: Your Honor, there is one final point. I'd like to invite the Court's attention to a motion to strike certain testimony of the witness Schmit [State's appraiser] that had been made during the time he was on the stand.

"I would like to ask the Court at this time to make a ruling.

[9]The State's appraiser also testified:

"As a result of the discussion which I had with Mr. Golden and Mr. O'Grady I went out and reinspected the areas in the field to reaffirm myself that existing uses of property were actually as they described them to me so I might consider not only what they told me but their reasons behind the discussion; to be certain I reviewed the zoning maps, official zoning maps, in the areas where there were points they called to my attention as a result of their more—their greater familiarity with zoning matters in the City of Los Angeles; and having satisfied myself that the physical factual conditions as they expressed them and the reasons which they expressed to me were a reality, *I then proceeded to instruct my engineer to change the indication of what my opinion of reasonable probability was*, and it ended up as it appears on Exhibit 30 which is in evidence." (Italics added.)

". . . . And my *original working sheet was then changed to* correspond to the expressions of the opinions and the reasons for those expressions of opinions as they were given to me." (Italics added.)

". . . . I learned from my investigation *that they [Golden and O'Grady] were in agreement with the thinking as I pointed it out*, and as the occupants of the area had indicated, that there would be a need for a parking. . . ." (Italics added.)

"*This was discussed with the City Planning and Zoning officials, and they were in agreement with my conclusion* on reasonable probability, the controlling factor being the established property rights of the residents who are in the area, that these people have very attractive one-story single family homes and well-maintained yards, fairly modern homes which have been built in there for 12 to 15-18 years, and which have a remaining life of perhaps another 40 years. . . ." (Italics added.)

"I got considerable assistance from outside sources in planning and having drawn my conclusions and prepared them on an exhibit I discussed the matter with both Mr. Golden and Mr. O'Grady, *and they concurred that as far as* the distance from Vanowen to the south point, that the breaking point would at least be equal to and in all probability would stop at the center line of Lemay Street extended easterly. They agreed that a logical stopping point was to continue from Laurel Grove Street southerly and to continue from the center line of Laurel Grove Street until the two lines intercepted. Now, that seemed logical to me." (Italics added.)

". . . . He would find if he were examining the area that Parcel 7 was in an R-1 area, and from my investigation of Parcel 7 and the City Planning and Zoning Departments, at the City Planning and Zoning Departments, *I again found agreement in the opinions* expressed and in the opinion formed by me, that Parcel 7 as to its entirety had a reasonable probability of the zone change remaining in the R-1 classification and no reasonable probability of a change of a zone to a higher and best use or a higher zone classification than R-1. . . ." (Italics added.)

"THE COURT: Ladies and gentlemen, the following question was asked of Mr. Schmit by Mr. Montoya who, as you know, is the attorney for the People. [The court then quoted the question set forth initially in this discussion of contention II.]

"Mr. Laskin, this is what you are asking to strike; is that correct?

"MR. LASKIN: Yes, your Honor.

"THE COURT: This motion by Mr. Laskin, the attorney for the City, to strike the answer given by Mr. Schmit is granted.

"The jury will disregard the answer heretofore given.

"Gentlemen, is there any further testimony to be brought to the attention of the Court?

"MR. MONTOYA [attorney for the State]: Your Honor, the People, at this time, rest.

"THE COURT: Is there any rebuttal testimony, counsel?

"MR. LASKIN: There is nothing further from the City, your Honor.

"MR. MONTOYA: Nothing further, your Honor." Further, no motion to recall witnesses Golden or O'Grady was made, though opportunity was presented. It comes too late to urge reversible error founded upon the ruling to this one question and answer when it appears that the State was willing to rest on the status of the record, including the six other references to the same subject matter. (*Henninger* v. *Southern Pac. Co.*, 250 Cal.App.2d 872 [59 Cal.Rptr. 76]; *Weller* v. *Chavarria*, 233 Cal.App.2d 234 [43 Cal.Rptr. 364].)

### III

■ The third question posed by the State is: "Do the words 'improvements *constructed* on the property' include 'improvements' *planted* or *grown* thereon?"

It is the position of the State that the wording of section 103.7 of the Streets and Highways Code limits the items for which compensation for the taking must be paid. In addition to the land itself, compensation for "the value of improvements constructed thereon" must be made. The crux of the dispute between the State and the City as to the meaning of this portion of the Code section revolves around landscaping. The State says that trees, grass and shrubs are not constructed improvements; the City says they are. While both parties agree that the landscaping mentioned constitutes "improvements," the meaning of "constructed" as used in the section is the definitive dispute.

While authoritative definitions[10] may be referred to in the absence of other clear indications of the meaning intended, to reach the proper conclusion, we must ascertain the intent of the Legislature. (*Espinosa* v. *Rossini*, 247 Cal.App.2d 40 [55 Cal.Rptr. 205]; *Kenney* v. *Wolff*, 102 Cal.App.2d 132 [227 P.2d 285].) To conclude that the legislators envisioned park construction as limited solely to the construction of buildings, pavements, and other fixed structural improvements, is to deny their regard for aesthetics. It seems reasonable to us that "to construct a public park" is much like "to construct a golf course" or "bridle trail." Can it be claimed that the improvements "constructed" on a golf course include the 18 holes in the ground and the 19th hole, but not the putting greens, sandtraps, and water hazards—or that a bridle trail is no construction at all since it is only a path, albeit one normally cleared of debris, rocks, or swamps, and of a width permitting the safe riding of a horse or horses, perhaps two or more abreast?

We conclude that the Legislature used the word "construct" in the instant section in the same context and with a similar meaning as expressed in section 29 subdivisions (e) and (f) of the Streets and Highways Code: " 'Construction includes: . . . (e) Any improvement excepting maintenance as defined in Section 27. (f) Such improvements, without being limited thereto, may include, where capital outlay is required, . . . roadside planting and weed control, . . .'" Thus, as stated in *City of Pasadena* v. *County of Los Angeles*, 37 Cal.2d 129 at p. 132 [230 P.2d 801], " 'construct' . . . generally import[s] the creation of something new and original that did not exist before. . . ." We conclude that grass and those shrubs and trees which were caused to be planted in the creation of the park are proper items to be considered compensable in the taking, and that trees, grass and shrubs which were *au naturel* are not includable for they were not "constructed" or "planted," and required no "capital outlay." (Sts. & Hy. Code, § 29, subd. (f).)

---

[10]Black's Law Dictionary (4th ed.) p. 386 defines "construct" as follows: "To build; erect, put together, make ready for use . . . To adjust and join materials, or parts of, so as to form a permanent whole. . . . To put together constituent parts of something in their proper place and order."

16A, C.J.S., p. 1231 states: " 'Construct' is used generally in the sense of 'create,' is said to signify the physical performance of the work required to bring the thing constructed into existence. . . ."

We find further support for this conclusion in the last paragraph of section 103.7 itself (as dealt with more fully hereinafter under question four). The provisions of Code of Civil Procedure section 1248[11] are incorporated within the last part of section 103.7 of the Streets and Highways Code, and it is important to note that that section refers to "improvements" under the subject "Value"; to "construction of the improvements" under the subject "Severance damages"; and to "structures or improvements" under the subject "Structures." Certainly if all the legislators had in mind were buildings and the like in ascertaining the value of that taken, by the wording of section 103.7, where it states "plus the value of improvements constructed thereon," the reference to section 1248 of the Code of Civil Procedure was totally meaningless.

## IV

The fourth and final question posed by the State is: "In considering damages to park property, may a before and after study of non-park highest and best use be used?"

The last sentence of the first paragraph of section 103.7 of the Streets and Highways Code is specific: "If the part taken is only a portion of a larger parcel of park property, the damage, if any, and the benefits, if any, to the remainder by reason of the taking and the construction of the highway improvements in the manner proposed shall be on the basis that the remaining property is devoted or dedicated to park

---

[11]Code of Civil Procedure section 1248, in part: "The court, jury, or referee must hear such legal testimony as may be offered by any of the parties to the proceeding, and thereupon must ascertain and assess:

"1. [Value.] The value of the property sought to be condemned, and all improvements thereon pertaining to the realty, and of each and every separate estate or interest therein; if it consists of different parcels, the value of each parcel and each estate or interest therein shall be separately assessed;

"2. [Severance damages.] If the property sought to be condemned constitutes only a part of a larger parcel, the damages which will accrue to the portion not sought to be condemned, by reason of its severance from the portion sought to be condemned, and the construction of the improvement in the manner proposed by the plaintiff;
" . . . . . . . . . . ''

"6. [Structures.] If the removal, alteration or relocation of structures or improvements is sought, the cost of such removal, alteration or relocation and the damages, if any, which will accrue by reason thereof;
" . . . . . . . . . . ''

purposes and offset in accordance with Section 1248 of the Code of Civil Procedure.''

We have examined the record, and find no substantial evidence to sustain a finding that any residual portion of a larger parcel would not continue to be used for park purposes, albeit ''to a limited extent.''[12]

Under this state of the record, there was error, for there was no issue of whether the residual portions were unusable for park purposes, and the jury should not have been called upon to determine severance damages without regard to park use, i.e., on the same basis of valuation as provided in the valuation of actual taking. This error, however, does not require a reversal of the judgment.

Since there is no suggestion of any other evidence of severance damages, the award in the amount of $39,888 for severance damages is stricken, and the judgment as so reduced is affirmed. Each party to bear his own costs.

Kaus, P. J., and Aiso, J., concurred.

A petition for a rehearing was denied June 4, 1969, and appellant's petition for a hearing by the Supreme Court was denied July 9, 1969.

---

[12]While the City's appraiser gave his opinion to the effect that he did not think it would be feasible to use some of the residual portions as a park, this opinion was nullified by the testimony of the City's General Manager of Recreation and Parks, Mr. Frederickson. Mr. Frederickson, on cross examination, admitted (contrary to his direct testimony) that each residual portion had a park use to a limited extent, and that in fact some of the residual portions (the portions for freeway offramp having in fact been taken at time of trial) were in actual use for park purposes, and that the City must keep the land as a park unless it was found to be not useful as a park (§ 170 Charter, City of Los Angeles).