[Civ. No. 33211. Second Dist., Div. Four. Oct. 20, 1969.]

UNITED CALIFORNIA BANK, as Trustee, etc.,
Plaintiff and Respondent, v.
THE PEOPLE ex rel. DEPARTMENT OF PUBLIC WORKS,
Defendant and Appellant.

2

**COUNSEL**

Harry S. Fenton, Joseph A. Montoya, Richard L. Franck, H. Dean Stillwagon and Robert W. Vidor for Defendant and Appellant.

Nichols, Stead, Boileau & Lamb, J. R. Kostoff and R. G. Lamb for Plaintiff and Respondent.

**OPINION**

**DUNN, J.**—This appeal by defendant flows from the second trial of an inverse condemnation suit, wherein plaintiff (respondent herein) received judgment for $54,625.

Respondent bank, as trustee, held title to the westerly half of the Orange Belt Emporium, a retail department store in the City of Pomona. In a north-

south direction the store property was 120 feet long and east-west it was 60 feet wide.[1] The agreed date of value was July 1, 1961. Then, and before, the property lay on the east side of Gàrey Avenue and was bounded on the north by First Street, on the south by Second Street and on the west by Garey Avenue. Evidence of a plan of downtown betterment appears in the record. Under it, Second Street was to be closed to vehicular traffic and transformed into a pedestrian mall for shoppers. First Street, east of Garey and just north of and abutting the store (called "old" First Street at the trial and herein) was to be closed at Garey and, as far east as Gibbs Street,

BEFORE

AFTER

---

[1]By an agreement with the owner of the other half, respondent held a 57½ percent interest in the property, taking that percentage of the income and paying that percentage of the expense.

moved northerly where it would then be an extension of that part of First Street which lay to the west of Garey; before, First Street was off-set at Garey. Just north of that part of old First Street which abutted the store was a Union Pacific Railway depot with parking lot; to the north of that lay a railroad right-of-way and tracks. Maps of the "before" and "after" conditions are reproduced herein for clarity. To move old First Street north required acquisition of the depot and its parking lot as well as a portion of the right-of-way, causing relocation of one line of tracks and a spur. Combining the space formerly occupied by old First Street with the depot and its parking lot, a new municipal parking lot was created.

Garey Avenue ran across the railroad right-of-way and tracks at grade, but the plan called for converting it to an underpass. Garey was the main north-south street in Pomona and ran along the westerly side of respondent's premises, it being paved and having sidewalks on either side. An entrance to respondent's building was located on that side, as were display windows. However, no parking was permitted on that side of the street, the curbing there being painted red. As an underpass, vehicles northbound on Garey would have no direct access to the new alignment of First Street nor to the old First Street area. Southbound vehicles, however, were provided with an up-curving ramp which led onto new First Street.

Several entities were concerned in the over-all plan of civic improvement. The public improvement undertaken by appellant was found by the trial court to be: (1) the construction of the underpass at Garey Avenue and (2) the off-ramp to First Street; (3) the relocation of old First Street easterly as far as Gibbs Street and (4) the closing of Gibbs Street and of Gordon Street at the points where each previously had crossed the railroad tracks. (Both were north-south streets, Gibbs being the second street east of Garey Avenue, with Locust Street lying in between; Gordon was the third street west of Garey with Thomas Street and Main Street in between.)

The proposed conversion of Second Street into a pedestrian mall was part of the over-all plan of downtown improvement but was no part of the work of improvement undertaken by the Department of Public Works, appellant herein. Work on the mall was begun and completed after the date of value but, as the plan was well known, the experts on both sides considered it "in contemplation" and as affecting the fair market value of the subject property both before and after the date of valuation. A parking district already had been created before the date of value and was considered in "before" and "after" valuation. Creation of the particular parking lot north of respondent's property was no part of the work undertaken by appellant. However, though not considered in evaluating the "before" condition, it was considered in evaluating the "after."

I. *Was There Actionable Interference With Plaintiff's Right Of Access?*

Appellant attacks the trial court's finding that defendant's public improvement caused, as stated in the findings, "a substantial impairment of

and interference with the plaintiff's rights of access in and to both Garey Avenue and former First Street."

The California Constitution (art. I, § 14) provides that "Private property shall not be taken or damaged for public use without just compensation" and ". . . compensation shall be ascertained by a jury, unless a jury be waived . . . . " ■ Not all damaging interferences with property rights are actionable, however, and a determination must be made as to whether there is an "actionable interference" with a property right; or, to use another term, "substantial impairment." It is the trial court, and not the jury, which makes this determination. *People* v. *Ricciardi* (1943) 23 Cal.2d 390, 398, 402-403 [144 P.2d 799]; *Breidert* v. *Southern Pac. Co.* (1964) 61 Cal.2d 659, 664 [39 Cal.Rptr. 903, 394 P.2d 719]. Since the opinion evidence received in the case at bench was in conflict we must determine if the evidence gives legal support to the trial court's findings, resolving all conflicts in favor of sustaining the judgment.

■ In the "before" condition of the subject property, Garey Avenue was at grade with First and Second streets. In the "after" condition this was changed. Garey descended to a depth of 25 feet underneath the railroad right-of-way, the slope downward beginning just north of Second Street (the mall "in contemplation") near the southwest corner of the subject property and gradually descending so that Garey Avenue was 7 feet lower at the northwest corner of the property. An iron guardrail was installed along the westerly edge of the sidewalk for pedestrian protection. As previously noted old First Street, where it abutted upon respondent's property, was blocked off at Garey, the street being relocated north of there.

In the before condition cars northbound or southbound on Garey could turn into old First Street and park along the curb but, following the date of valuation, northbound cars had to traverse the underpass, turning right at Monterey Street and proceeding east to Palomares Street, then south to new First Street and west to the new parking lot north of respondent's store. On the other hand southbound vehicles, after proceeding in the underpass to the south edge of the right-of-way, could take the up-curving ramp to new First Street, turning east to an entrance into the new parking lot. Cars eastbound on old First Street could stop along the south curb to discharge or pick up passengers and also to park, there being parking meters there; or they could proceed to a municipal parking lot located north of First Street, east of the Union Pacific Depot and west of Gibbs Street. This could not be done in the after condition. Also, visibility of the building, particularly from the north, and the exposure of its show windows was reduced by the construction of the underpass.[2]

---

[2]Shortly before July 1, 1961, and being aware of the proposed changes in Garey Avenue, respondent blocked its show windows on the Garey Avenue side and closed its main entrance there, opening a new entrance on the north side of the building. This would not have been done but for the planned changes mentioned.

The work done by appellant thus: (1) closed old First Street where it abutted respondent's store (the area being transformed, though not by appellant, to form part of a parking lot) and (2) relocated First Street to the north, (3) required southbound vehicles intending to visit respondent's store to use the up-curving ramp in order to turn into new First Street and thence into the new parking lot, and (4) impaired the view of the westerly side of the store including its display windows.

■ It is noted the trial court made no separate finding that the impairment to the visibility of the store was actionable, its formal finding being that ". . . there has been a substantial impairment of and interference with the plaintiff's rights of access in and to both Garey Avenue and former First Street." It did, however, instruct the jury that such impairment could be considered by an expert witness in forming his opinion of market value. An explicit finding should, perhaps, have been made (*People* v. *Ricciardi, supra,* at p. 404;[3] however, see: *People* ex rel. *Dept. of Public Works* v. *Becker* (1968) 262 Cal.App.2d 634, 641 [69 Cal.Rptr. 110]) but such a finding is, in any event, implicit in the instruction and in the jury's verdict and may not now be disturbed.

■ There can be no doubt that property abutting a highway has an easement of ingress and egress, a free and convenient use of access to such highway. The store front on the Garey Avenue side occupied the entire lot, according to the maps in evidence, and had no vehicular entryway leading directly onto that street. In like manner, no driveway led from the premises onto old First Street. We are thus faced not with loss of vehicular ingress and egress but with vehicular accessibility or availability to the property.[4] Old First Street no longer existed as a usable street but only as part of a parking lot. The intersection of old First Street and Garey was blocked off, precluding cars northbound or southbound on Garey from turning into it and stopping at the curb adjoining the north side of respondent's store.

Though the substantiality or actionability of the impairment of an access easement is said to be a matter of law, for determination by the trial court, it may, in truth, be a mixed question of law and fact as noted later herein.

---

[3]At page 404 the court states: "The weight of authority seems to be in favor of the proposition that an abutting owner of property on a public highway has an easement of reasonable view of his property from the highway . . . . Here again it was for the trial court to determine whether the obstruction caused by the underpass would unreasonably cut off defendants' property from visibility by travelers on the main highway, and, the right being substantially impaired, the amount of damage was a question for the jury. The findings and conclusions of the trial court implicit in the verdict are supported by the evidence and may not now properly be disturbed."

[4]Both experts agreed the continued use of the property as a small or medium-sized department store constituted its highest and best use. Accordingly, we need not speculate whether other use would require installation of driveways.

(See: *Breidert* v. *Southern Pac. Co.* (1969) 272 Cal.App.2d 398, 409 [77 Cal.Rptr. 262].) So far as the law is concerned our search has failed to disclose any case factually similar. The distinctions drawn in *People* ex rel. *Dept. of Public Works* v. *Becker, supra,* differentiating that case from earlier decisions, apply to the present action, which also is factually unlike them and additionally unlike *Becker.* . Here, Garey Avenue in front of the store was not closed, only lowered in level and separated by a guardrail from the sidewalk making it unusable as a place for store customers to board and alight from vehicles. From the north, a southbound traveler's view of the store was impaired by the underpass, reducing the store's visibility impact. The relocation of First Street was not merely a diversion of traffic away from the north side of the store by the creation of a new street where none previously existed; old First Street was closed off from Garey Avenue and became part of a parking lot. The combination of appellant's several works of improvement thus effectually interfered with respondent's rights of access and exposure. No mere rerouting of traffic is involved; rather, a substantial change in the streets themselves as they relate to respondent's property. We hold actionable interference was established.

II. *Did The Trial Court Err In Holding The Liberation Of Old First Street For Parking Could Not be Considered In Evaluating Special Benefits, If Any?*

Respondent's expert witness gave the opinion no "special benefits" accrued to the property as a result of the changes. Appellant's expert testified to a contrary opinion, initially stating special benefits totaled $4,500. The opinion was based upon alleged advantages arising from substitution of new for old First Street, the freeing of old First Street for parking and the giving to new First Street of an access into the new parking lot. The witness had testified that he considered the parking north of the subject property as being "in contemplation" on July 1, 1961, so that it affected the "before" value of the property and also the "after" value.

 Respondent's counsel moved to strike that part of his opinion assigning any special benefit value to the parking facility created north of the subject property by the freeing of First Street. The court granted the motion in private discussion with counsel. In open court, the judge did not advise the jury that the evidence was stricken, but did state that the use of old First Street as a parking lot was not an element that could be considered in determining special benefits. Following this the witness was asked to give his opinion of the value of special benefits excluding any consideration of the improper element, and gave a revised value of $2,000. He based this on a claimed improvement of the view of the property and on a "betterment of the overall street system" resulting from the construction of the off-ramp from Garey into new First Street.

Section 1248, subdivision 3, of the Code of Civil Procedure, in treating special benefits, limits the same to those arising from ". . . the construction of the improvement proposed . . . ." (Generally, also see: 17 Cal.Jur.2d Rev., pp. 825-829, Eminent Domain §§ 151, 152.) Here, though appellant's work included the barricading of old First Street at Garey, the development of it thereafter for parking use was no part of its work; hence, the development could not constitute a special benefit.

Appellant contends the trial court erred in its ruling. Assuming transformation of old First Street into a parking facility was no part of appellant's construction, appellant argues it still was an element of a general scheme of public improvement in which respondent participated and, as such, should be considered. Thus, though appellant played no direct part in the conversion, which was carried out by the City of Pomona, appellant contends it was entitled to rely on the planned changes to show a special benefit. We do not agree. Respondent's participation in the City of Pomona's general plan was only to the extent hereinbefore noted. Under that plan the city had no obligation to respondent to take over old First Street or to convert it to parking purposes.

Reliance is placed by appellant on *People* ex. rel. *Dept. of Public Works* v. *Hurd* (1962) 205 Cal.App.2d 16 [23 Cal.Rptr. 67]. There, defendants owned property straddling the San Diego Freeway and Sepulveda Boulevard (which parallels it, more or less), the property extending from Mulholland Drive on the north to Casiano Drive (near Sunset Boulevard) on the south. The People already had acquired land needed to construct the freeway, and the suit was to acquire additional land for slope easements and for the purpose of temporary construction easements, the same to be used partly for freeway purposes and partly for the relocation of Mulholland Drive and other streets necessitated by the freeway construction. Defendants there complained because a state expert gave his opinion as to special benefits deriving from construction of improvements on other than those parts of the property being taken. The court held such opinion testimony was proper. Appellant in our case relies upon language in that opinion (p. 24) quoting from a text writer as follows: "When, however, several elements are part of one general scheme of public improvement, the benefit from the whole may be considered, although the taking was for only one element."[5] Appellant overlooks, however, that the improvements there were to be made by the plaintiff, itself, on land it already had acquired, as part of plaintiff's over-all development. In our case, the construction was not performed by

---

[5] The quotation is from 3 Nichols on Eminent Domain (3d ed.) section 8.6201. The revised 3d edition cites but two cases in support. These are the *Hurd* case, itself, and a 1907 Massachusetts decision, *American Unitarian Assn.* v. *Commonwealth* (1907) 193 Mass. 470 [79 N.E. 878]. The latter case merely holds that the appellant was estopped from suing for damages allowed by a statute and, at the same time to claim the statute was unconstitutional.

respondent. We conclude the language quoted from the *Hurd* case is restricted to the facts there being considered and has no application to the present circumstances.

*Beveridge* v. *Lewis* (1902) 137 Cal. 619 [67 P. 1040, 70 P. 1083, 92 Am. St. Rep. 188, 58 L.R.A. 581], cited by appellant is not in point. *People* ex rel. *Dept. of Public Works* v. *City of Los Angeles* (1963) 220 Cal.App.2d 345 [33 Cal.Rptr. 797], also is not in point as being factually quite distinguishable from our own case. There, the condemning body relocated a portion of an existing street and that, coupled with effective abandonment of the street by another city, gave the condemnee 1.04 acres of land as a special benefit.

Though the use of old First Street for parking purposes as part of the new northerly parking lot may well have been part of Pomona's over-all plan of improvement, and though such was the reasonably probable result of the closing of old First Street by appellant, nevertheless any benefit to respondent came from action by the city and not from construction by appellant. The trial court properly precluded consideration of the evidence mentioned, for special benefit purposes.

III. *Did The Trial Court Err Prejudicially In Instructing The Jury That Respondent's Rights Were Substantially Impaired?*

██ The trial court instructed the jury ". . . the Court finds as a matter of law that there has been a substantial impairment or interference with the plaintiff's private right of access in both Garey Avenue and former First Street . . . ." Appellant contends the giving of such instruction was error and prejudicially so; error because it violates Evidence Code, section 405 and prejudicial because it appears to tell the jury that respondent has suffered substantial damages. Forthrightly, appellant cites *People* v. *Loop* (1954) 127 Cal.App.2d 786, 803-804 [274 P.2d 885], as making a directly contrary holding, but distinguishes it as arising before the Evidence Code became effective.[6]

Section 405 of the Evidence Code relates to a determination, not governed by sections 403 or 404, of a disputed preliminary fact insofar as such fact may govern admissibility of evidence. It states: "(b) If a preliminary fact is also a fact in issue in the action: (1) *The jury shall not be informed of the court's determination* as to the existence or nonexistence of the preliminary fact." (Italics added.) It is contended the court's determination that appellant's impairment of respondent's right of access was actionable constituted a decision on a preliminary fact and the jury should not have been told of the court's decision for that reason.

Appellant quotes language from *People* ex rel. *Dept. of Public Works* v.

---

[6]Trial of the present case began 1/24/67, after the new Evidence Code became effective, on 1/1/67.

*Becker, supra,* at p. 639: "It [*i.e.*: substantial impairment of access] is in any event a question to be determined by the trial judge as a preliminary to submitting to the jury the question of the amount of damage . . . ." However, this language is not apropos since it deals, not with the admissibility of evidence relating to damages, but with the propriety of the jury's consideration of damages as an issue.

■ The first question to be answered is whether a matter of law or of fact is involved, for Evidence Code, section 310 states: "(a) All questions of law . . . are to be decided by the court." Section 400 states: "As used in this article, 'preliminary fact' means a fact upon the existence or nonexistence of which depends the admissibility or inadmissibility of evidence." (The definition of "law" in Evid. Code, § 160 is not helpful here.) We conclude a matter of law is involved. While the trial court may be called upon to determine the facts from conflicting evidence, ultimately it determines if, assuming such facts, an actionable interference is shown. As previously mentioned herein, it is not every interference with a right of access that is an actionable one; whether it is or is not is a legal question the determination of which constitutes a legal conclusion.

Having concluded Evidence Code, section 405 does not render it inappropriate for a trial judge to instruct a jury regarding the point, we next consider whether the instruction given correctly embodied the principle or was prejudicially misleading. As already noted, the *Loop* case held that a trial court acted in error in refusing to instruct a jury of its finding that defendants' right of access ". . . has been substantially impaired." The instruction there offered had the saving grace of containing the further admonition: "It is for you, however, to determine the extent of that impairment in money." Such explanatory phrase was not contained in the instruction here given by the court and now objected to by appellant.

One well may question whether an instruction, telling the jury of the court's finding, is needed at all, since the jury is concerned only with determining damages and not with whether a legal right to consider damage exists.[7] The vice of a judge's informing a jury, as here, that a party has sustained "substantial impairment" is that it may erroneously convey to the jury the thought that the judge feels damages should be "substantial." If a similar instruction is to be used at all, the term "actionable interference" may be more felicitous.

While to a nervous trial lawyer, the word "substantial" may signify "large" this is not the meaning necessarily conveyed to a jury of lay persons. (See: Webster's Third New Internat. Dict.) Assuming that the jurors may have heard the term through the over-sensitive ears of a trial attorney, we nevertheless find such possible error not to have been preju-

---

[7]We suggest a more appropriate way of phrasing the instruction, if to be given at all, appears in No. 11.87 of the new BAJI (5th rev. ed.) published in 1969.

dicial. Appellant has singled out one instruction; but it is Hornbook law that all instructions are to be considered together, and as a whole. Indeed, the jury was instructed to that effect in the present case. The trial court gave numerous other instructions which, taken in conjunction with the offending instruction, clarifies the point and, if error existed minimized it.[8] In summary, we conclude there was no error in instructing on the point and, if the form of instruction was erroneously misleading, such error was without prejudice under the circumstances.

Judgment for plaintiff is affirmed.

Kingsley, J., concurred.

**FILES, P. J.**—I concur in the judgment, but do not join in the discussion of "special benefits." The trial court advised counsel and instructed the jury in substance that although the additional parking on old First Street was not a "special benefit," it could be considered as a part of the after condition in relation to the claimed diminution of the value of plaintiff's property. This ruling did not prejudice defendant. The court gave defendant the opportunity to present to the jury its theory that the improved parking along the north side of the property tended to ameliorate the disadvantageous aspects of the project.

A petition for a rehearing was denied November 4, 1969.

---

[8]We do not burden this opinion with a recital of the other instructions but, for the litigants' benefit, note the court gave BAJI (4th ed.) Nos. 501-A, 502-A (rev.); plaintiff's instruction Nos. 8, 16, 25 (the offending instruction) and defendant's instruction Nos. 17 and 23. On its own motion, the court also gave BAJI instruction No. 509.