[Civ. No. 38949. First Dist., Div. Two. Apr. 13, 1978.]

ORPHEUM BUILDING COMPANY et al.,
Plaintiffs and Appellants, v.
SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT,
Defendant and Appellant.

864

**COUNSEL**

Dobbs, Doyle & Nielsen, James T. Johnson, Fitzgerald, Johnson, Berg & Edgar for Plaintiffs and Appellants.

Rogers, Vizzard & Tallett, John H. Tallett, Bledsoe, Smith, Cathcart, Boyd & Eliot and Rogers P. Smith for Defendant and Appellant.

## OPINION

**TAYLOR, P. J.**—The owners, Orpheum Building Company (Orpheum) and their lessee, Northcoast Theatres Corporation (Northcoast), appeal from an adverse judgment after a bifurcated trial of their complaint against Bay Area Rapid Transit District (BART) alleging causes of action for inverse condemnation, nuisance, trespass and third party beneficiary. On the bifurcated cause of action for inverse condemnation, the jury found no damages and special benefits. As to inverse condemnation, Orpheum and Northcoast contend that: 1) they were deprived of a jury trial; 2) the court erroneously restricted the period of recovery to one year; 3) the court improperly excluded evidence of noise, loss of easement of view, dust and fumes as a basis of liability; and 4) the court prejudicially refused to permit the jury to consider loss of rental income as an element of damages. As to the other causes of action, Orpheum and Northcoast contend that they were deprived of a jury trial and that the court erred in concluding that there was no basis of liability for nuisance. BART cross-appeals from a minute order[1] granting reimbursement of costs to Orpheum and Northcoast and denying them to BART. For the reasons set forth below, we have concluded that there is no merit to any of these contentions.

The basic facts are not in dispute and were found as follows by the trial court: Orpheum owned property at 1176-1190 Market Street in San Francisco (city). The Orpheum property was improved by an office building and a theatre building. The theatre was leased to Northcoast.

In June 1967, construction of the BART Civic Center Station was commenced within the confines of Market Street, a city street. A portion of the construction activity was in the street area adjacent to the Orpheum property. The construction was substantially completed in February 1971 and fully completed in April 1971. The Civic Center Station was built below the surface of the street area and involved construction activities on the surface of the street as well. BART, by law, as well as by agreement with the city, had a right to use and occupy the public street to construct the Civic Center Station.

---

[1]Although BART's notice of appeal indicates that its appeal is taken from that portion of the judgment awarding costs to Orpheum and Northcoast, the record does not contain an amended judgment incorporating the minute order on costs.

In the course of the construction of the Civic Center Station, BART's contractors necessarily excavated portions of Market Street near the Orpheum property with the use of heavy construction equipment. Piledrivers were used to construct walls, to support the underground station and subway. At all times during construction, some physical access to and from the Orpheum property, including the theatre, was provided by the contractor. From time to time during the course of construction, while use was made of heavy construction equipment including piledrivers and jack hammers, vehicular and pedestrian traffic was diverted in the street adjoining the Orpheum property. Wooden sidewalks were constructed, normal street activities were disrupted, and dust and noise resulted.

During the course of construction of the BART Civic Center Station, to protect the safety of the public and pedestrians, it was necessary to erect and maintain protective barriers approximately eight feet high on the sidewalk in front of the Orpheum property to separate pedestrian traffic from the construction activity. Except for a six-month period, the protective fences were maintained ten feet from the property line of the Orpheum property. From January 5 to June 17, 1968, and for other temporary intervals, the fences were placed at a five-foot distance from the property line to permit the construction of a mezzanine wall for the underground station.

The activities of BART and its contractors in its construction of the BART Civic Center Station were reasonable and necessary in order to accomplish the public project according to the plans and specifications. The evidence introduced by Orpheum and Northcoast showed no physical damage or physical invasion by the construction activity.

At no time during the construction did BART or its contractors trespass on the Orpheum property.

No agreement between BART and the city contains any provision which would inure to the benefit of Orpheum or Northcoast or provide, either expressly or impliedly, that Orpheum or Northcoast were third party beneficiaries of that agreement. The same is true of the permits issued to BART or its contractors by the city.

The maintenance of a sidewalk barrier within five feet of the Orpheum property line for the period January 5, 1968, to June 17, 1968, resulted in

substantial interference with access to the property, and it is for a jury to determine the damages, if any. Orpheum and Northcoast are also permitted to claim damages, if any, resulting from the access limitation for the additional period from June 17, 1968, to January 15, 1969. No other activities on the part of BART resulted in the taking or damaging of the Orpheum property.

We turn first to the contentions pertaining to inverse condemnation. Orpheum and Northcoast first argue that they were deprived of a jury trial on the issue of BART's liability for inverse condemnation.

■ As indicated above, the inverse condemnation cause of action was bifurcated pursuant to Code of Civil Procedure section 598, leaving the liability issue to be determined by the trial court and the damages, if any, by the jury. This has long been the proper procedure in this state (*People* v. *Ricciardi,* 23 Cal.2d 390, 402 [144 P.2d 799]). As stated in *United Cal. Bank* v. *People* ex rel. *Dept. Pub. Wks.,* 1 Cal.App.3d 1, 6 [81 Cal.Rptr. 405]: "Not all damaging interferences with property rights are actionable, however, and a determination must be made as to whether there is an 'actionable interference' with a property right; or, to use another term, 'substantial impairment.' It is the trial court, and not the jury, which makes this determination."

The gravamen of the cause of action for inverse condemnation was the impairment of access. Whether there has been substantial impairment of access is a mixed question of law and fact, and, therefore, to be determined by the trial court before submission of the damage question to the jury (*Breidert* v. *Southern Pac. Co.,* 272 Cal.App.2d 398, 409 [77 Cal.Rptr. 262]). The same is true of noise (*Aaron* v. *City of Los Angeles,* 40 Cal.App.3d 471, 484 [115 Cal.Rptr. 162]), and of temporary interference or unreasonable delay by the public agency (*City of Los Angeles* v. *Lowensohn,* 54 Cal.App.3d 625 [127 Cal.Rptr. 417]). The evidence adduced in the three-week liability portion of the trial was properly weighed by the trial judge alone. Thus, Orpheum and Northcoast were not deprived of a jury on their cause of action for inverse condemnation.

Orpheum and Northcoast next contend that the court erred in restricting BART's potential inverse condemnation liability to interference with access. They contend that the court erroneously precluded them from presenting to the jury evidence of unreasonable delay, noise,

and loss of easement of view, as well as dust and fumes as a basis of liability.[2]

██ The applicable principle of law was summarized in *People* v. *Ayon,* 54 Cal.2d 217 [5 Cal.Rptr. 151, 352 P.2d 519], as follows, at page 228: "Temporary injury resulting from actual construction of public improvements is generally noncompensable. Personal inconvenience, annoyance or discomfort in the use of property are not actionable types of injuries. [Citations.] 'It would unduly hinder and delay or even prevent the construction of public improvements to hold compensable every item of inconvenience or interference attendant upon the ownership of private real property because of the presence of machinery, materials, and supplies necessary for the public work which have been placed on streets adjacent to the improvement.' (*Heimann* v. *City of Los Angeles, supra,* 30 Cal.2d [746] at p. 755 [185 P.2d 597].) Appellants are not entitled to compensation for temporary interference with their right of access, provided such interference is not unreasonable, that is, occasioned by actual construction work. It is often necessary to break up pavement, narrow streets and provide inconvenient modes of ingress and egress to abutting property during the time streets are being repaired or improved. Such reasonable and temporary interference with the property owner's right of access is noncompensable."

Orpheum and Northcoast failed to adduce any evidence that any delays, noise, dust and fumes, or the loss of view were unreasonable or unusual, given the size and scope of the Civic Center Station construction project. The uncontroverted evidence indicated that the Civic Center Station required a heavier foundation than the others, as the older buildings in the area had no foundations, only wooden mud sills. One of the alternatives under the contract provided for the construction of a soilder pile tremie concrete wall (SPTC) for the Civic Center Station. This type of construction was slower and more expensive than others; however, it was preferable from a long range point of view.

The building of the SPTC wall involved excavation from below, while a bentonite slurry mixture is poured in from the top. The specific gravity of the mixture can be controlled by the addition of bentonite until its specific gravity is equal to that of the surrounding soil; it then acts as a brace. The process is a messy one but presented no problems at the

---

[2]Only damages to the theatre were claimed. No offers of proof were made as to the alleged damage to the office building.

construction site. The 84,000 gallon tank for the slurry was located on Fulton Street close to the stage door of the theatre.

Orpheum and Northcoast's own expert, Mr. Hayler, indicated that the design alternatives to the SPTC wall permitted by the contract would not have provided any less interference with the Orpheum property. In his opinion, the alternative superstructure would have been more restrictive of sidewalk access. All of the witnesses indicated that the contractor was efficient, cooperative and did the work in a reasonable manner, and corrected conditions that were called to his attention.

Orpheum and Northcoast rely on *City of Los Angeles* v. *Ricards,* 10 Cal.3d 385 [110 Cal.Rptr. 489, 515 P.2d 585], to argue that unreasonable temporary interference with the use of property is compensable. As indicated above, no unreasonable interference was established here.

As to delay, the record indicates that an initial three-month delay occurred because of Orpheum's position on the vaults and the problems of the closure wall its contractor had built. Additional delays were caused by the city's June 1967 passage of the bonds for the Market Street beautification project.

As to noise, the initial stages of construction were the noisiest. The steam pile driver which was the most intrusive piece of equipment increased the sound level inside the theatre 1,800 percent. Pile driving occurred from August 1967 until June 1968; however, the pile driving in front of the Orpheum Theatre lasted from February 5 to March 5, 1968. At this time, the theatre was closed. When the theatre was open, employees in the box office on Market Street had trouble hearing. While the noise could also be heard in the theatre office on the corner of Hyde and Market Streets, it was possible to function over the telephone in the back part of the office. The theatre installed drapes and a baffle to cushion the noise in the interior of the theatre. Although patrons complained and refunds were given when sought, no film was ever discontinued because of the noise.[3] Although records were kept, the amounts and frequency of refunds were never established. The major portion of the theatre was on the Fulton Street side of the building; this

---

[3]This contradicted the testimony of Orpheum and Northcoast's acoustical engineer (based on an experimental reconstruction of conditions) that the outside noises would have made it impossible for patrons to hear either the music or dialogue of the films, as the noise level inside the auditorium was 1,700 percent in excess of the desirable criteria.

portion of the building, with its single wall construction, was most vulnerable to outside noise. There were double walls on the Market Street side. During the time here in issue, the construction occurred chiefly on the Market Street side of the property. This portion of the construction was completed in the spring of 1971.[4]

As to the dirt and fumes, the only evidence adduced indicated that the theatre was cleaned between the afternoon and evening showings. However, there was no indication as to whether this was an unusual procedure and if so, for how long it was necessary.

As to the interference with its easement view, the uncontroverted evidence indicated that eight-foot-high protective sidewalk plywood fences were erected in the fall of 1967. In July 1968, the top portion of the fence was replaced with wire mesh. However, during the peak period[5] of construction in the fall and winter of 1967, attendance at the Orpheum Theatre averaged over 8,000, as high as it had been during the best part of the run of *Dr. Zhivago* from February 8, 1966, to May 14, 1967.

We conclude that the trial court properly limited BART's potential inverse condemnation on liability to lack of access.

Orpheum and Northcoast next contend that the trial court erroneously restricted BART's liability for impairment of access to the one year from January 15, 1968, to January 15, 1969, instead of permitting recovery for a period of over three years from the commencement of construction in the fall of 1967 until completion in the spring of 1971.

The record indicates that in the initial stages of construction, utilities were relocated and the major excavation for the station made in the street. The protective sidewalk fences were erected in the fall of 1967 when a wall was constructed in front of the Orpheum property for the shell of the station. At the same time, the municipal railway tracks were first relocated to traffic lanes outside the excavation area, and then relocated in the center of Market Street over the top of the construction

---

[4]Orpheum and Northcoast did not plead, but sought to introduce evidence relating to the later phase of the underground finishing of the station and the construction of the plaza on the Fulton Street part of the building for the city.

[5]Except for the Christmas and New Year holidays, the contractor operated on a 24-hour schedule at this time.

area. Also in the fall of 1967, Orpheum put in the required closure wall for its property and removed the marquee[6] from the theatre.

Aside from the sidewalk, the interference with access to the theatre resulted from the re-routed traffic patterns which were the responsibility of the city. The stops for the streetcars on Market Street were moved from the front of the theatre to Jones Street. Traffic on Market Street was cut off between Seventh and Eighth Streets. Cars and matinee buses could no longer conveniently drop off patrons in front of the theatre and then turn down Hyde Street to the parking lot behind the theatre. This area became a yard for construction materials and equipment.

BART's agreement with the city and the construction contract contemplated 10-foot sidewalk areas. However, from January 15, 1968, to June 17, 1968, the construction required a reduction of the sidewalk area in front of the theatre to five feet. Nevertheless, the trial court allowed an additional period of time from June 1968 to January 1969. As indicated above, the theatre was closed during this period.

Relying on authorities indicating that a public entity may be liable for inverse condemnation where its conduct is a substantial cause of the injury (*Ingram* v. *City of Redondo Beach,* 45 Cal.App.3d 628, 632-633 [119 Cal.Rptr. 688]), Orpheum and Northcoast sought to establish that: 1) a substantial contributing factor to the closure of the theatre in 1968 was the lack of access caused by the BART construction; 2) the access problems prevented the booking of "road show" top-grade films such as *Space Odyssey*; and 3) a decision was made to take a fixed loss by closing the theatre.

The record, however, indicates that after the theatre was closed in March 1968, no more efforts were made to book films. The theatre reopened in November 1968 for a 10-12 week run of *Ice Station Zebra* but then remained closed for most of 1969. In 1970, the theatre was leased for a stage show production of *Hair,* which ran for almost nine months of its one-year lease. The attendance for *Hair* was about 8,000 per week.

[6]Orpheum had permits from the city to occupy vault space and to maintain theatre marquees. Prior to commencing construction, BART commenced a condemnation proceeding (S.F. Super. Ct. No. 576764) against Orpheum to establish its right to use the vault areas and air space over the street. In this proceeding, Orpheum entered into a stipulated judgment that acknowledged the right of BART to occupy and construct in the sidewalk and admitted that Orpheum had no property rights in the street or sidewalk area.

After the first phase of the construction was completed and the sidewalks restored in 1971, no attempts were made to reopen the theatre or secure films.

In addition, Orpheum and Northcoast's own witnesses indicated that between 1966 and 1974, the business changed from a theatre-exhibitor "buyer's" market to a motion picture producer-distributor "seller's" market. With its 1,431 seats[7] and weekly operating expenses of $7,500, the Orpheum was substantially larger than most of its competitors with 300-1,200 seats. In 1968, other large theatres, like the St. Francis and Golden Gate, were "twinned." The public's motion picture habits also changed between 1965 and 1968. There was competition from television, theatres in shopping centers and other outlying parts of the city. The Northpoint Theatre opened in 1967 and became a competitor. Around November 1968, the "road show" type of distribution ceased, as film companies needed money more quickly. Thus, the evidence indicated that the new pattern of film distribution was responsible for the unfavorable terms on which *Space Odyssey* was offered to Northcoast.

We conclude that the trial court properly restricted BART's potential liability for inverse condemnation to the one-year period when access to the theatre was substantially impaired.

Orpheum and Northcoast next argue that the court erred to their prejudice by precluding the jury from considering Orpheum's loss of rental income for the theatre as an element of damages. The record is to the contrary. Before the jury, Orpheum and Northcoast presented appraisal testimony indicating that in this period, they sustained a temporary rental loss of $397,000 and a permanent reduction in market value of $589,000. This testimony was predicated on their theory that the theatre had to close permanently because of the BART construction and did not take into account the changes in the film industry or the rental for *Hair* in 1970. The theatre was leased for five-year terms. From 1965 to 1971, the annual rent was $85,900. In 1970, Northcoast's rent was reduced to $42,500 and then to $24,000. In 1970, however, Northcoast received a full annual rent of $92,500 for the nine-month-long stage production of *Hair.* Although Market Street had been fully restored by then, the May 1971 renewal term was also at $24,000. The theatre was not reopened because of its loss of image and the lost momentum.

---

[7]Prior to its conversion for Cinerama in 1963, the Orpheum had about 3,600 seats.

BART's witnesses, however, indicated that the theatre closing was the result of the changing economic conditions in the film industry. As a result of fewer quality films, contracts less favorable to the exhibitor, and the practice of advance bidding, large theatres with high operating costs could not compete with the newer and smaller theatre complexes. The jury apparently agreed with the BART witnesses as it concluded that Orpheum and Northcoast had sustained no damages but were specially benefited in the amount of $105,830 by the proximity to the new BART station. The record also indicates that the jury was instructed on loss of rental income.

We conclude that there is no merit to any of the contentions related to inverse condemnation.

We turn next to the contentions that Orpheum and Northcoast were deprived of a jury trial on their causes of action for nuisance, trespass and third party beneficiary.

The record indicates that the court initially granted BART's motion to dismiss these causes of action on the basis of a nonsuit. Thereafter, the court indicated that instead of a dismissal, it intended to grant the motion in favor of BART on these causes of action on the merits. Subsequently, in response to an inquiry from Orpheum and Northcoast's counsel, the court indicated that the effect of its ruling was the same as if there had been motions for a nonsuit pursuant to Code of Civil Procedure section 581c. However, findings pursuant to Code of Civil Procedure section 631.8 were requested and prepared.

Orpheum and Northcoast on appeal assert that the court erroneously granted BART's motion for a nonsuit on their cause of action for nuisance, and at the same time complain that the trial court deprived them of a jury trial on the nuisance, trespass and third party beneficiary causes of action by deciding these on the merits. BART has chosen to more or less ignore this contention but apparently assumed that the trial court conducted a trial on the merits pursuant to Code of Civil Procedure section 631.8. The evidence pertaining to all four causes of action was identical. Given the confusion reflected by the record, we have concluded that the most expeditious approach under the circumstances is to treat the trial court's action as the granting of a nonsuit under Code of Civil Procedure section 581c. Preliminarily, we note that on appeal, Orpheum

and Northcoast have confined their discussion to the nuisance cause of action.[8]

Civil Code section 3479, so far as pertinent, defines a nuisance as "Anything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of . . . any public . . . street, . . ."

Civil Code section 3482 provides: "Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance." The applicable rules pertaining to Civil Code section 3482 were recently summarized by our Supreme Court in *Varjabedian* v. *City of Madera*, 20 Cal.3d 285, at page 291 [142 Cal.Rptr. 429, 572 P.2d 43], as follows: "However, the exculpatory effect of Civil Code section 3482 has been circumscribed by decisions of this court. In *Hassell* v. *San Francisco* (1938) 11 Cal.2d 168, 171 [78 P.2d 1021], we said: ' "A statutory sanction cannot be pleaded in justification of acts which by the general rules of law constitute a nuisance, unless the acts complained of are authorized by the express terms of the statute under which the justification is made, or by the plainest and most necessary implication from the powers expressly conferred, so that it can be fairly stated that the Legislature contemplated the doing of the very act which occasions the injury." ' This interpretation was reiterated in *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 938 [101 Cal.Rptr. 568, 496 P.2d 480], and we adhere to it in the case at bar. A requirement of 'express' authorization embodied in the statute itself insures that an unequivocal legislative intent to sanction a nuisance will be effectuated, while avoiding the uncertainty that would result were every generally worded statute a source of undetermined immunity from nuisance liability."

The San Francisco Bay Area Rapid Transit District Act (Pub. Util. Code, §§ 28500-29750), so far as pertinent, expressly empowers BART to construct any and all facilities necessary or convenient for rapid transit service and use public streets for this purpose (Pub. Util. Code, § 29031). Viewing all of the evidence in their favor, Orpheum and

---

[8]In the absence of any serious contentions pertaining to the evidence as to the trespass and third party beneficiary causes of action, we deem these abandoned on this appeal. We note that absence of trespass was stipulated and that almost no evidence pertaining to the third party beneficiary cause of action was adduced during the three-week liability phase of the trial.

Northcoast, in the liability phase of the trial, failed to show that any acts of BART were not authorized or necessary for the construction of the Civic Center Station. Orpheum and Northcoast rely on authorities, such as *Venuto* v. *Owens-Corning Fiberglas Corp.,* 22 Cal.App.3d 116 [99 Cal.Rptr. 350], and *Bright* v. *East Side Mosquito etc. Dist.,* 168 Cal.App.2d 7 [335 P.2d 527], indicating that a public entity may be liable for nuisance if the acts done pursuant to statute are not done in a reasonable manner. As indicated above, there was no evidence indicating that either the choice of the alternative of construction of the SPTC wall or the manner in which it was done was unreasonable or unreasonably noisy or dirty, given the size and scope of the project. Contrary to Orpheum and Northcoast's contentions, the court properly excluded evidence of lost profits and business damage. These items are noncompensable (*People* v. *Ayon, supra,* 54 Cal.2d 217).

Orpheum and Northcoast also contend that the court erred in not considering the evidence of noise, loss of the easement of view, and dust and fumes as to the nuisance cause of action. As indicated above, the only extensive evidence adduced was that of Orpheum and Northcoast's acoustical engineer. Although his testimony indicated a noise level of 1,700 percent in excess of the desirable one for a theatre, this was only a temporary condition while the pile driver was in use.

The record fully supports the granting of a nonsuit on the cause of action for nuisance.

Finally, we turn to BART's cross-appeal from the minute order awarding costs to Orpheum and Northcoast and denying BART's request for costs.

The right to an award of trial costs is not a constitutional right but set by the Legislature (*Williams* v. *Atchison etc. Ry. Co.,* 156 Cal. 140 [103 P. 885]). Former Code of Civil Procedure section 1255 (enacted in 1872) left in the discretion of the trial court the power to grant costs to *either* side in an eminent domain action. Subsequently, our Supreme Court held that the constitutional provision requiring reimbursement upon a taking or damaging of property mandates that the property owner must be reimbursed for his costs (*San Francisco* v. *Collins,* 98 Cal. 259 [33 P. 56]). The court reasoned at page 262 that: "To require the defendants in this case to pay any portion of their costs necessarily incidental to the trial of the issues on their part, or any part of the costs of the plaintiff, would

reduce the just compensation awarded by the jury, by a sum equal to that paid by them for such costs."

The Legislature recently codified this rule in Code of Civil Procedure section 1268.710 (Stats. 1975, ch. 1275, § 2, operative July 1, 1976). Code of Civil Procedure section 1268.710 replaced former section 1255.

The principle has been applied to inverse condemnation actions and was codified in 1971 by the addition of Code of Civil Procedure section 1246.3, set forth below[9] (*Collier* v. *Merced Irr. Dist.*, 213 Cal. 554 [2 P.2d 790]; *Los Angeles* v. *Ricards, supra,* 10 Cal.3d 385). *Heimann* v. *City of Los Angeles, supra,* 30 Cal.2d 746, indicated at page 753, that the principle is particularly applicable in inverse condemnation since the property owner is forced to take on the government's role in initiating the proceedings.

■ BART contends that Orpheum and Northcoast should have been denied costs since they did not recover damages in this action. Logically, the constitutional argument does not apply to property owners who bring inverse condemnation actions and fail to prove a taking or damage by a government entity (*Los Angeles* v. *Ricards, supra,* 10 Cal.3d at p. 391). However, in *Ricards,* our Supreme Court held, at page 391, that minimal, insubstantial or nominal damages provide a sufficient basis for an award of costs. The instant case is analogous to *Ricards, supra,* as it also involved a temporary restriction of access. In both instances, the benefits accrued from the public project offset any damages suffered. Accordingly, the trial court's award of costs in the instant case was proper.

BART further argues that *County of Los Angeles* v. *Ortiz,* 6 Cal.3d 141 [98 Cal.Rptr. 454, 490. P.2d 1142, 68 A.L.R.3d 538], dispels the constitutional compulsion to award costs to the property owner and, therefore, they should not have been awarded to Orpheum and Northcoast here. We do not agree. *Ortiz, supra,* held at page 146 that the *Collins* rule

---

[9]"In any inverse condemnation proceeding brought for the taking of any interest in real property, the court rendering judgment for the plaintiff by awarding compensation for such taking, or the attorney representing the public entity who effects a settlement of such proceeding, shall determine and award or allow to such plaintiff, as a part of such judgment or settlement, such sum as will, in the opinion of the court or such attorney, reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding." This statute, since repealed (Stats. 1975, ch. 1275, § 1, operative July 1, 1976) was in effect at the time of the instant trial.

(*supra,* 98 Cal. 259), discussed above, is limited to normal trial costs and does not extend to "litigation" costs, such as attorney fees and expert witness fees. *Ortiz,* reiterated (at pp. 148-149) that the allowance of costs is a policy decision left to the Legislature rather than the courts to decide. In the instant case, as approved in *Ortiz,* the costs awarded were limited to jury and statutory witness fees. The record indicates that the trial court specifically excluded Orpheum and Northcoast's request for attorney fees and the cost of the expert witnesses.

■ BART also contends that Orpheum and Northcoast should have been denied all costs based on their refusal to accept a compromise settlement pursuant to Code of Civil Procedure section 998. Section 998 provides that a party will be barred from the recovery of costs if, after refusing to accept the compromise settlement, he does not obtain a judgment more favorable to his interest than the compromise offer.

The question here is whether subdivision (f) of section 998 is applicable in an inverse condemnation situation. Subdivision (f) voids the provisions of section 998 where the plaintiff in an eminent domain proceeding makes the offer. The plaintiff in the normal eminent domain proceeding is the government entity. BART relies on cases and code provisions that distinguish between eminent domain and inverse condemnation, none of which are apposite here. We can see no legitimate reason why subdivision (f) should not apply to the action herein. We cannot believe that the Legislature sought to distinguish between government entities when they are called plaintiffs or when they are called defendants in actions that are substantially identical. Therefore, we hold that subdivision (f) applies. Therefore, the award of costs to Orpheum and Northcoast was not barred by its refusal of the compromise settlement offer.

The judgment and minute order appealed from are affirmed. Orpheum and Northcoast to have their costs on appeal.

Kane, J., and Rouse, J., concurred.

A petition for a rehearing was denied May 12, 1978, and the petition of the plaintiffs and appellants for a hearing by the Supreme Court was denied June 9, 1978.