[No. B140899. Second Dist., Div. Six. Sept. 25, 2001.]

GEORGE GOEBEL et al., Plaintiffs and Appellants, v.
CITY OF SANTA BARBARA, Defendant and Respondent.

550

**COUNSEL**

Joseph Liebman and Thomas Daniel Platt for Plaintiffs and Appellants.

Daniel J. Wallace, City Attorney, and Janet K. McGinnis, Assistant City Attorney, for Defendant and Respondent.

**OPINION**

**COFFEE, J.**—Plaintiffs and appellants George and Carol Goebel own real property that has been condemned due to landslide conditions which began in February of 1998 during the El Niño rainstorms. The Goebels sued defendant and respondent City of Santa Barbara (the City) on the theory that a break in one of its water mains damaged their property and caused the landslide that led to the condemnation of their home. They appeal from a judgment entered in favor of the City on their claims of inverse condemnation, nuisance and the maintenance of a dangerous condition on public property. We affirm.

### FACTS AND PROCEDURAL HISTORY

The Goebels purchased the home at 475 Ranchito Vista Road in 1988. The property is located at the bottom of Sycamore Canyon near Sycamore Creek in the lower portion of a watershed. The hillside on which the property sits is composed of ancient landslide debris.

The City maintains a 12-inch diameter cast iron water main under Ranchito Vista Road, uphill of the Goebels' property. The main line was installed in 1956, and there were breaks in the line near the Goebels' property in 1973, 1990 and 1995. The latter two breaks were attributed to possible ground movement. Additionally, there have been breaks in area water service lines leading from the main line in 1984, 1989 and 1995, possibly due to ground movement.

During the winter of 1997-1998, Santa Barbara County received a record amount of rainfall due to El Niño conditions. Over 40 inches fell during the season, releasing more than 27 million gallons of water into the watershed area above Ranchito Vista Road. Thirty percent of this rainfall would have penetrated the ground. The hillside above the Goebels' property became saturated, reactivating the ancient landslide, which became known as the Ranchita slide. Landslides that were already active on other hillsides in the Sycamore Canyon area moved further as a result of the rains.

On February 15, 1998, the main line ruptured near the Goebels' home and released approximately 118,000 gallons of water before it was shut down and repaired. This break caused no visible damage to the Goebels' property. On February 24, the main line broke again, releasing approximately 79,000 gallons of water. City crews shut off the water and conducted repairs, but when they turned the water back on, they discovered another break in the pipe. Repairs were made again, but the pipe was abandoned after a third break was discovered. The breaks on February 24, and possibly the break on February 15, were caused by earth movement attributable to the Ranchita slide.

Some of the water released from the main line as a result of the February 24 break ran down the hillside into the Goebels' backyard and swimming pool. At about the same time, the Goebels discovered that the carpet in their home was wet. The landslide movement that had caused the main line to break had also caused a pipe in their slab foundation to break. An adjuster from the City's risk management department visited the site of the main line break and spoke to the Goebels regarding water that had run into their yard. The Goebels did not inform her that any of the water from the main line had run into the house, and she saw no evidence of water intrusion from the break in the main line.

The Ranchita slide continued to move down the hill toward the Goebels' home. A house above the Goebels' property was covered by the slide within a few weeks. Earth movement under the Goebels' property caused several cracks in their walls and floors. On March 1, 1998, the property was "yellow-tagged," indicating that it could become a danger. The landslide continued to move and the property was condemned the following year.

The Goebels filed a claim with the City, alleging that the February 24 main line break had damaged their real property. After that claim was rejected, they filed suit against the City for inverse condemnation, nuisance and the maintenance of a dangerous condition on public property. The Goebels rejected a $25,000 settlement offer made pursuant to Code of Civil

Procedure section 998 (hereafter section 998) and the case proceeded to trial. The trial court sat as the trier of fact on the issue of the City's liability for inverse condemnation, while the jury heard the same evidence on the tort claims of nuisance and maintenance of a dangerous condition.

The Goebels' theory of the case was that the City knew the main line was located in an ancient landslide area susceptible to earth movement. During the El Niño rains, the landslide was reactivated and caused the main line to break; the water from this break entered the ground near the Goebels' home and caused a second landslide to develop. It was this second landslide that resulted in the condemnation of the Goebels' home. The Goebels also claimed that water from the main line had directly entered their home when the pipe burst.

In support of this theory, the Goebels presented the expert testimony of Elaheh Kherkhahi, a civil engineer with Lockwood, Singh and Associates. According to Kherkhahi, the upper portion of the Ranchita slide caused the City's main line to break, thus triggering a second, lower slide. In Kherkhahi's opinion, the lower slide was caused by the pressure of water from the main line break that had pooled beneath the surface. Kherkhahi stated that the main line should not have been buried in an ancient landslide area, and that had it not been for the water from the main line break, the lower slide would not have occurred and the slope threatening the Goebels' property would not have failed.

Kherkhahi's explanation of the slide was contradicted by the testimony of Roger Slayman, an engineering geologist who had consulted with the City about landslides in the Sycamore Canyon area. Slayman testified that there was only one landslide, not two, and it had been triggered by the El Niño rains. In Slayman's opinion, the water from the main line was a "drop in the bucket" compared to the rain that had fallen during El Niño. Because the ground was already saturated when the water main broke on February 24, very little water from the break would have penetrated the ground, and this water would not have significantly altered the progress of the Ranchita slide.

Frank Kenton, an engineering geologist familiar with the soils in the Sycamore Canyon area, was asked by the City to determine the cause of the Ranchita slide. He testified that it was obviously caused by the "rare, intense and sustained rainfall" during the 1997-1998 rainy season. Kenton disagreed with Kherkhahi's theory that a subsurface pool of water from the main line would have undermined the slope, because the soils were heavily saturated and there was no mechanism for the water to migrate down to the Goebels' property or otherwise influence the slide.

After the close of evidence, the trial court ruled that the Goebels had not carried their burden of proving inverse condemnation because they had not established a causal connection between the broken water main and the damage to the Goebels' property. It directed a verdict on that cause of action in favor of the City.

The remaining causes of action were submitted to the jury along with special verdict forms. Question No. 1 of the verdict form on the nuisance claim asked, "Did the ownership, maintenance, or operation of [City's] water main located under Ranchito Vista Road result in an intrusion or interference with the free use or comfortable enjoyment by the plaintiffs of their home on or after February 24, 1998?" The jury answered "Yes." Question No. 2 asked, "Did the intrusion or interference cause plaintiffs to suffer substantial actual damage?" The answer was "No." The verdict form on the dangerous condition claim asked, "Was the public property in question in a dangerous condition at the time of the accident in question?" to which the answer was "No." Based on these responses, the court entered judgment in favor of the City and awarded $63,368.49 in costs.

## DISCUSSION

### Inverse Condemnation

■■, ■■ ■ ■ The Goebels contend the trial court erred when it determined that the City had no liability for inverse condemnation of their property.[1] They essentially argue that the evidence established a taking as a matter of law. We disagree.

■ To prevail in an action for inverse condemnation, a claimant must prove that a public entity has taken or damaged his or her property for public use. (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 939-940 [55 Cal.Rptr.2d 724, 920 P.2d 669].) Physical injury to real property is compensable when it is proximately caused by a public improvement " 'as deliberately designed and constructed.' " (*Pacific Bell v. City of San Diego* (2000) 81 Cal.App.4th 596, 602 [96 Cal.Rptr.2d 897].) The injury need not be foreseeable, but the public improvement must be a substantial cause of the injury. (*Akins v. State of California* (1998) 61 Cal.App.4th 1, 20, fn. 13 [71 Cal.Rptr.2d 314].)

■ The damage claimed by the Goebels was the loss of their real property due to the Ranchita landslide. The trial court determined that the

[1]In an inverse condemnation case, the issue of a public entity's liability is generally determined by the trial court and the amount of compensation, if any, by the jury. (*Marshall v. Department of Water & Power* (1990) 219 Cal.App.3d 1124, 1141 [268 Cal.Rptr. 559].)

break in the City's main line was not a substantial cause of that damage. This is a finding of historical fact to which we must defer if it was supported by substantial evidence. (See *Ali v. City of Los Angeles* (1999) 77 Cal.App.4th 246, 250 [91 Cal.Rptr.2d 458].) It was.

Two engineering geologists testified that the Ranchita slide was a single landslide activated by heavy rains. Both of them agreed that the break in the water main was not a factor contributing to the slide. The trial court was the sole judge of the experts' credibility and found their testimony to be more persuasive than the contrary testimony of the Goebels' expert. (See *Lauderdale Associates v. Department of Health Services* (1998) 67 Cal.App.4th 117, 127 [78 Cal.Rptr.2d 802].) Substantial evidence supports the trial court's determination that the Goebels did not prove the causation element of their inverse condemnation claim. (*City of Commerce v. National Starch & Chemical Corp.* (1981) 118 Cal.App.3d 1, 18 [173 Cal.Rptr. 176].)

The Goebels argue that if the water main did not cause the landslide, they should nonetheless be compensated for damage caused by water intrusion inside their home. They claim that the trial court expressly determined that water from the main line break "went right through" the house, yet paradoxically declined to send the case to the jury to determine just compensation.

The Goebels take the court's remarks out of context. The court did not make a finding that water from the break had entered their home or destroyed their property; it simply noted that there was some evidence of water intrusion that would justify submitting the tort claims to the jury. The great weight of the evidence was that the water in the house on February 24 came from broken pipes in the foundation rather than from the City's water main, and that while some City water had flowed onto the property and into the swimming pool, it had *not* entered the house. Read as a whole, the trial court's remarks show that it believed some City water had entered the Goebels' backyard and pool, but that this damage did not amount to a taking under the state Constitution.

### Evidence of the 1990 Main Line Break

In 1990, the main line under Ranchito Vista Road broke in the same vicinity as it did in February of 1998. The water released during that incident flowed onto the Goebels' property, flooding their home and causing a *significant amount* of damage. The Goebels filed a claim against the City and eventually settled for $100,000. The City's own evaluation of that incident indicated that the break in the main line was due to earth movement.

The trial court ruled that the Goebels could present evidence of the 1990 break (along with evidence of other prior breaks in the main line and service lines in the area) to show that the City was on notice of a dangerous condition; namely, the placement of the main line in an area where soils conditions made it likely that the pipe would rupture due to earth movement. It excluded evidence that water from the 1990 break had damaged the Goebels' property, concluding that such additional evidence would be irrelevant and was barred by the terms of the parties' settlement agreement in the earlier case. The Goebels complain that they were prejudiced by this aspect of the court's ruling and should have been allowed to testify about the damage caused by the 1990 break. We disagree.

■ A plaintiff seeking recovery for a dangerous condition of public property must prove: the property was in a dangerous condition when the injury occurred; the dangerous condition was a proximate cause of the injury; the dangerous condition created a reasonably foreseeable risk of the kind of injury that occurred; and the public entity had sufficient prior notice of the dangerous condition to enable it to have undertaken measures to protect against such condition. (*Ramsey v. City of Lake Elsinore* (1990) 220 Cal.App.3d 1530, 1537 [270 Cal.Rptr. 198].) Because the jury determined by special verdict that the water main did not create a dangerous condition, we consider the admissibility and impact that the excluded evidence would have had on this threshold element.

■ The Goebels argue that evidence about the damage caused by the 1990 break was admissible to prove the existence of a dangerous condition because it would have demonstrated that the risk created by the water main was a significant one. But there was no suggestion that the damage caused by the 1990 break resulted in a landslide condition similar to that for which the Goebels were seeking recovery. " 'Before evidence of previous injuries may be admitted on the issue of whether or not the condition as it existed was in fact a dangerous one, it must first be shown that the conditions under which the alleged previous accidents occurred were the same or substantially similar to the one in question.' " (*Fuller v. State of California* (1975) 51 Cal.App.3d 926, 943 [125 Cal.Rptr. 586].) Due to the dissimilarity between the water damage caused by the 1990 break and the landslide in 1998, evidence of the earlier incident was not admissible to prove the existence of a dangerous condition.

We also observe that despite the trial court's ruling excluding evidence of the 1990 damage, the Goebels' counsel elicited some testimony on this subject during the cross-examination of William Thomas, a manager in the City's water department. Thomas had reviewed the City's report regarding

the 1990 break and testified that according to that report, the area of the Goebels' home had been "washed out and undermined." The court admonished the jurors that the Goebels were claiming no damages for the 1990 break, but did not advise them to disregard Thomas's testimony. The jury thus was aware that the Goebels' property had been damaged as a result of the 1990 break in the water main.

### Expert Witness Fees as Costs

■ The Goebels rejected the City's pretrial offer to compromise their claims for $25,000, which was made pursuant to section 998. The trial court's award of costs to the City as the prevailing party in the litigation included $51,653.75 for expert witness fees under section 998, subdivision (c)(1). The Goebels contend the award of expert fees was unauthorized because section 998 does not apply to eminent domain proceedings and their claim for inverse condemnation was a form of eminent domain. We disagree.

Section 998, subdivision (c)(1), provides, "If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff shall not recover his or her postoffer costs and shall pay the defendant's costs from the time of the offer. In addition, *in any action or proceeding other than an eminent domain action*, the court . . . , in its discretion, may require the plaintiff to pay a reasonable sum to cover costs of the services of expert witnesses . . . by the defendant." (Italics added.) Section 998, subdivision (g), provides, "This chapter does not apply to an offer that is made by a plaintiff in an eminent domain action."

The validity of the court's fee award depends on whether "eminent domain," as used in section 998, should be read to include "inverse condemnation." ■ As in any case involving statutory interpretation, our fundamental task is to determine the Legislature's intent so as to effectuate the law's purpose. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].) We begin by examining the statute's words, giving them their usual and ordinary meaning, and looking to the entire substance of the statute to determine the scope and purpose of the provision. (*West Pico Furniture Co. v. Pacific Finance Loans* (1970) 2 Cal.3d 594, 608 [86 Cal.Rptr. 793, 469 P.2d 665].)

■ Inverse condemnation, like eminent domain, implements the constitutional rule that private property may not be taken or damaged for public use without just compensation. (Cal. Const., art. I, § 19; *San Diego Gas & Electric Co. v. Superior Court*, *supra*, 13 Cal.4th at p. 939.) But the proceedings are not synonymous, and the terms are not interchangeable. In an

eminent domain proceeding, a public entity files suit to condemn a piece of private property that is necessary for a public use. In an inverse condemnation action, the property owner seeks just compensation from a public entity that has taken or damaged property for a public purpose. (See *Customer Co. v. City of Sacramento* (1995) 10 Cal.4th 368, 376-377 [41 Cal.Rptr.2d 658, 895 P.2d 900].)

If the Legislature had intended to restrict the use of section 998 offers in all inverse condemnation actions, we believe it would have done so explicitly. Though inverse condemnation has been described as " 'an eminent domain proceeding initiated by the property owner rather than the condemner' " (*Customer Co. v. City of Sacramento, supra*, 10 Cal.4th at p. 377, fn. 4), the Legislature plainly does not equate the two procedures for all purposes. The Law Revision Commission Comment introducing the Eminent Domain Law states, "The provisions of the Eminent Domain Law are intended to supply rules only for eminent domain proceedings. The law of inverse condemnation is left for determination by judicial development." (Cal. Law Revision Com. com., 19 West's Ann. Code Civ. Proc. (1982 ed.) foll. § 1230.020, p. 395.)

The Goebels rely on *Orpheum Bldg. Co. v. San Francisco Bay Area Rapid Transit Dist.* (1978) 80 Cal.App.3d 863, 878 [146 Cal.Rptr. 5], which held that section 998 did not authorize an award of costs against an inverse condemnation plaintiff that obtained a judgment less favorable than the public entity's settlement offer. The court reasoned that because an inverse condemnation claim was "substantially identical" to an eminent domain proceeding, the provisions that rendered section 998 inapplicable to eminent domain applied equally to a settlement offer made by a governmental entity on an inverse condemnation claim. (*Orpheum Bldg. Co.*, at p. 878.)

*Orpheum* is distinguishable because in that case the governmental entity *had* interfered with the plaintiff's use of its property. (*Orpheum Bldg. Co. v. San Francisco Bay Area Rapid Transit Dist., supra*, 80 Cal.App.3d at pp. 867-868.)[2] An award of costs against a party whose property has been taken or damaged by a governmental entity would reduce the just compensation mandated by the state Constitution. (*City of Los Angeles v. Ricards* (1973) 10 Cal.3d 385, 390-391 [110 Cal.Rptr. 489, 515 P.2d 585]; *San Francisco v. Collins* (1893) 98 Cal. 259, 262-263 [33 P. 56].) It does not matter whether

---

[2]The plaintiff in *Orpheum* was a theater owner that claimed the construction of a subway station interfered with access to its property and resulted in a loss of revenue. The owner did not obtain a monetary award because the jury determined that it had not suffered damage as a result of this interference and had in fact received a benefit worth over $100,000 as a result of the new station. (*Orpheum Bldg. Co. v. San Francisco Bay Area Rapid Transit Dist., supra*, 80 Cal.App.3d at p. 874.)

the property owner is a defendant in an eminent domain proceeding or a plaintiff in an inverse condemnation action; in either situation, an award of section 998 costs against a prevailing property owner is prohibited.

Here, however, the Goebels did not prevail on their inverse condemnation claim. The court determined there was no taking or damage by the City. "In such a circumstance the constitutional doctrine of full compensation underlying the award of costs is plainly inapplicable to owners who initiated the unsuccessful litigation." (*City of Los Angeles v. Ricards, supra,* 10 Cal.3d at p. 391.) There is no constitutional bar to assessing costs against an unsuccessful inverse condemnation plaintiff, and no policy reason to excuse such a plaintiff from paying expert fees under section 998. (See *Locklin v. City of Lafayette* (1994) 7 Cal.4th 327, 377 [27 Cal.Rptr.2d 613, 867 P.2d 724]; *Smith v. County of Los Angeles* (1989) 214 Cal.App.3d 266, 297 [262 Cal.Rptr. 754].)

The *Orpheum* court's restriction of section 998 costs should be limited to cases in which the property owner has proved a taking or damage under the Constitution. To the extent that *Orpheum* can be read more broadly to exclude section 998 costs in all inverse condemnation proceedings, regardless of outcome, we respectfully disagree with its conclusion. The City was properly awarded expert fees under section 998 as a cost of defending the inverse condemnation claim.

The judgment is affirmed. Respondent shall recover its costs.

Yegan, Acting P. J., and Perren, J., concurred.